# GEORGE B. LOVING COMPANY, Appellant, v. HESPERIAN CATTLE COMPANY et al.

## Division Two, June 30, 1903.

1. **Agency: REVOCATION.** Where there is an agency to sell a ranch at a reasonable commission, and no time is agreed upon within which the sale must be made, either party is at liberty to withdraw from the arrangement prior to the procuring by the agent of a purchaser ready and willing to enter into a contract on the principal's terms.

2. ———: ———: **SUBSEQUENT SALE.** Where the owner of a ranch employs an agent to sell his property for him, and then withdraws his property from sale before a purchaser is found or any negotiations are made with a purchaser which afterwards are productive of a sale, a subsequent sale by the owner, even though the purchaser was sent to the owner by the agent after the agency was revoked and the property withdrawn from sale, does not entitle the agent to commissions.

3. ———: ———: **ESTOPPEL: PLEADING.** Where it is claimed that the principal is estopped to deny the agency by his conduct after the agency was revoked, such estoppel, being estoppel *in pais*, must be pleaded.

4. ———: ———: **RATIFICATION.** The procuring and sending of a purchaser to the owner of a ranch by one whose agency had been previously revoked, and the acceptance of such purchaser by the vendor with knowledge that the former agent had procured and sent him to the vendor to buy the property, in order to be held a ratification of the former agency, and to entitle the agent to a commission because of such ratification, must be pleaded.

5. ———: ———: ———: **REPUDIATION.** But if such ratification were pleaded, it would be completely met by a showing that the principal from the date of the revocation had by frequent letters repudiated the agent's right to sell the property and had, long before the sale was made, notified him that he would not recognize his claim to commissions even if a sale were made to the person whom he afterwards sent to the vendor.

Appeal from Jackson Circuit Court.   *Hon. J. H. Slover,* Judge.

AFFIRMED.

*J. D. McCue, F. D. Mills, Geo. E. Miller* and *A. L. Matlock* for appellant.

(1) Defendants employed plaintiff as a broker upon the stipulated commission of $5,000, 'to procure a purchaser for defendants' ranch and cattle, located in Texas, the price and terms to be fixed by defendants who were to conduct the negotiations and conclude the sale in person. By the terms of this employment, plaintiff performed its entire contract and was entitled to the commission, when it found and procured Richards as a prospective buyer, and sent him to defendants to negotiate a purchase, and defendants accepted him as a buyer, and sold the ranch and cattle to him. Bell v. Kaiser, 50 Mo. 150; Tyler v. Parr, 52 Mo. 249; Wood v. Stevens, 46 Mo. 555; Timberman v. Craddock, 70 Mo. 638; Gelatt v. Ridge, 117 Mo. 553; Gatts v. Foster, 18 Mo. App. 639; Goff v. Gibson, 18 Mo. App. 1; Beaucham v. Higgins, 20 Mo. App. 514; Henderson v. Mack, 64 Mo. App. 393; Stinde v. Bleasch, 42 Mo. App. 481; Blackwell v. Adams, 28 Mo. App. 61; Bass v. Jacobs, 63 Mo. App. 393; Lunnay v. Healey, 44 L. R. A. 613.

(2) The court erred in ruling that defendants' letter of March 12th was an absolute and unconditional withdrawal of the agency of plaintiff, and that whatever plaintiff did thereafter in procuring Richards as a purchaser, was without authority, a voluntary act, and plaintiff should not recover anything therefor. We challenge this ruling on two grounds: First. Defendants are estopped from interposing this defense, as it is inconsistent with the position assumed by them in their letters of September 24th and 28th and November 7th, in the controversy between them and plaintiff, as to plaintiff's right to a commission in the event of a sale to Richards. The rule is: When a person gives a reason for his conduct and decision in a matter in controversy, he will not be permitted, after driving his opponent to litigation, to change his ground, and put

his conduct and decision upon another and different consideration. He is not permitted to mend his hold. He is estopped from doing this by the sound principles of law. Hammon v. Myer, 45 Ark. 50; Railroad v. McCarthy, 96 U. S. 258; Gould v. Banks, 8 Wend. 562; Holbrook v. Wright, 24 Wend. 169; Everett v. Saltus, 58 Wend. 474; Duffy v. Donavan, 46 N. Y. 223; Winter v. Colt, 7 N. Y. 288; Mooney v. Elder, 56 N. Y. 238; Meinche v. Falk, 61 Wis. 623, 21 N. W. 785; Davis v. Dix, 64 Fed. 411; Ballou v. Sherwood, 32 Neb. 689, 49 N. W. 796; Harris v. Chapman, 9 Utah 105, 33 Pac. 243; Fernzer v. Dufrene, 58 Neb. 436, 78 N. W. 720; Wallace v. Elevator Co., 36 Minn. 465, 35 N. W. 269; Wyatt v. Henderson, 31 Or. 55, 48 Pac. 792; St. Louis v. Gas. Co., 5 Mo. App. 524; McDonald v. Hooker, 57 Ark. 638. Second. The court erred in its decision that defendants' letter of March 12th, constituted an absolute and unconditional withdrawal of plaintiff's agency. This was based upon the consideration of a single clause in the letter, containing the words, ''We have concluded to withdraw our ranch from sale for a while.'' The court held, as a matter of law, that this ended plaintiff's agency. Whether this agency was revoked by defendants was to be gathered from a consideration of the whole letter and all the facts and circumstances as shown in the evidence. This was a question of fact, to be determined by the jury. Walsh v. Hill, 38 Cal. 48; Speed v. St. Louis, etc. Co., 68 Fed. 23; Wolf v. Dyer, 95 Mo. 545, 8 S. W. 551; Bass v. Jacobs, 63 Mo. App. 393; Young v. Stephens, 66 Mo. App. 226. (3) If the letter of March 12th was a revocation of plaintiff's agency, and plaintiff did not have authority on March 31st to procure and introduce Richards as a prospective buyer of defendants' ranch, the acceptance by defendants of Richards as a prospective purchaser, with full knowledge that he had been sent by plaintiff, would, under the circumstances in this case, operate as a ratification and render defendants liable for the con-

tract price for the services. Hullig & Co. v. Gitchell, 69 Mo. App. 121; Gass v. Steun, 21 N. E. 549; Girnon v. Terrill, 38 Ala. 208; Ehrsam v. Mahan, 52 Kan. 245; Watson v. Pifer, 47 Mo. 415; Barrett v. Davis, 104 Mo. 561; Bryant v. Moore, 26 Mo. 84, 1 Am. and Eng. Ency. Law (2 Ed.), 1195, 1196, 1206, 1203.

*Scarritt, Griffith & Jones* for respondents.

(1) The only question under the pleadings in this case is, did the appellant procure W. Q. Richards as a purchaser of respondents' property (if at all) during the period of its employment under the contract made in December, 1897? (2) A party is bound by the allegations of his pleadings; he can not plead a contract and performance, as was done in this case, and attempt to prove a ratification or estoppel. It has always been the law of this State that it is error to submit to the jury any issue of fact concerning which no allegation is made in the pleadings. The trial issues must be within the paper issues. Fulkerson v. Thornton, 68 Mo. 468; Kenny v. Railroad, 70 Mo. 252; Melvin v. Railroad, 89 Mo. 106; Rothschild v. Fernsdorf, 21 Mo. App. 318; Whitlock v. Appleby, 49 Mo. App. 295; Field v. Railroad, 76 Mo. 614; Halpin Mfg. Co. v. School District, 54 Mo. App. 371; Steinberg v. Ins. Co., 49 Mo. App. 255. (3) Neither ratification nor estoppel was pleaded and, hence, can not be considered in the determination of this case, even if there was any evidence of either. Chance v. Jennings, 159 Mo. 558; Railroad v. Curtis, 154 Mo. 20; Noble v. Blount, 77 Mo. 242; Bray v. Marshall, 75 Mo. 330; Price v. Hallett, 138 Mo. 573; Avery v. Railroad, 113 Mo. 568; Ferneau v. Witford, 39 Mo. App. 316; Webb v. Allington, 27 Mo. App. 571. (4) The letter of March 12, 1898, and the reply thereto, terminated plaintiff's employment and agency under the contract counted on in the petition. Gaty v. Foster, 18 Mo. App. 645; Vandyke & Co. v. Walker, 49 Mo. App. 384; 1 Am. and Eng. Ency.

of Law, pp. 1216 and 1219; Mechem on Agency, secs. 216-220; Rees v. Pellow, 97 Fed. 167. (5) Defendants had a right to terminate such employment and agency in the manner in which it was done. State ex rel. v. Walker, 88 Mo. 279; Burke v. Priest, 50 Mo. App. 310; Page. v. Griffins, 71 Mo. App. 524; Missouri v. Walker, 125 U. S. 339; Rees v. Spruance, 45 Ill. 310; Levy v. Coogan, 16 Daly (N. Y.) 137; Liebfold v. B. I. Co., 83 N. Y. 378; Briggs v. Rowe, 1 Ab. App. Dec. 189; Neal v. Lehman, 11 Tex. Civ. App. 461; Barley v. Smith, 103 Ala. 641; Ames v. McNally, 6 Miss. 94; Slater v. Holt, 10 N. Y. S. 261. (6) The question at issue under the pleadings being based wholly on documentary evidence in the shape of letters, which were unambiguous in their terms, it was the duty of the court to pass upon their legal effect. State v. Lefaure, 53 Mo. 470; Edwards v. Smith, 63 Mo. 119; Willard v. Sumner, 7 Mo. App. 577; Brooks v. Ins. Co., 11 Mo. App. 350; Miller v. Dunlap, 22 Mo. App. 97; Thomas v. Ins. Co., 47 Mo. App. 169; Mantz v. McGuire, 52 Mo. App. 136; Enterprise Soap Works v. Sayers, 55 Mo. App. 15.

GANTT, P. J.—This is an appeal from the circuit court of Jackson county, Missouri. At the close of plaintiff's case the defendants, by way of demurrer to the evidence, asked the court to instruct the jury that under the pleadings and evidence, the plaintiff was not entitled to recover, and thereupon and before the court had sustained said demurrer, plaintiff took a nonsuit, with leave to move to set the same aside, and afterwards within four days moved the court to set aside said nonsuit, and the court declining to do so, plaintiff appealed.

The pleadings, omitting caption, are as follows:

### Petition.

"The George B. Loving Company, plaintiff, complaining of the Hesperian Cattle Company, Phil E.

Chappell, J. L. Smith, H. Clay Ewing and G. H. Brandt, defendants, for its cause of action, says:

"Plaintiff is a private corporation duly organized and existing under and by virtue of the laws of the State of Texas, and is, and at all times hereinafter mentioned was, engaged in business as a broker in the sale and purchase of ranches and cattle in the State of Texas, and has its principal office in the city of Fort Worth, in said State. Defendant Hesperian Cattle Company, is a corporation duly organized under the laws of the State of Missouri, and has its principal place of business in Jefferson City, Missouri, and defendants, Phil E. Chappell, J. L. Smith, H. Clay Ewing, and G. H. Brandt, are the owners of the capital stock of said defendant corporation, and comprise its board of directors, and defendant, Phil E. Chappel, is its president and active manager.

"Heretofore, to-wit, on or about the 1st day of December, 1897, defendant, Hesperian Cattle Company, owned and was in possession of a large ranch consisting of about ninety thousand acres of land in Cottle and Foard counties, in the State of Texas, together with the cattle therein, of all classes, consisting of about eight thousand head. In the month of December, 1897, said Hesperian Cattle Company, being desirous of selling its said ranch and cattle above mentioned, employed the plaintiff to find for said defendant company a purchaser for said properties, with the purpose and intent that such purchaser should negotiate directly with the defendant company, and said defendant company promised and agreed to pay the plaintiff the sum of $5,000 for obtaining such purchaser, provided such negotiations resulted in a sale of said property. . . . Thereafter and before the month of September, 1898, plaintiff procured one W. Q. Richards, who was ready, willing and able to purchase said properties of the defendant company on terms satisfactory to said defendants, and put said Richards in communication with the said defendant company, and afterwards in the

month of November, 1898, said defendant company sold to said W. Q. Richards all of its said ranch and cattle at a price and on terms satisfactory to said defendants, and received the purchase price therefor, and thereby became liable and promised to pay the plaintiff the sum of $5,000 at the time of said sale, and though often requested said defendant has heretofore failed and refused and still fails and refuses to pay the same or any part thereof. Immediately after the sale above mentioned, and the payment of the purchase price for said ranch and cattle, defendants, Phil E. Chappel, J. L. Smith, H. Clay Ewing and G. H. Brandt, divided all of the assets of the Hesperian Cattle Company among themselves, and each of them received from said company in said division property of value greater than five thousand dollars, and became severally liable for all the debts of said defendant company and severally became liable to this plaintiff for the sum of five thousand dollars, and since said distribution said defendant company has abandoned its business.

"As a further cause of action, by way of second count, plaintiff says [This count is a reiteration of the first, except the following allegation]: In the month of December, 1897, said defendant Hesperian Cattle Company being desirous of selling its said ranch and cattle above mentioned, employed the plaintiff to find for defendant company a purchaser for said properties, with the purpose and intent that such purchaser should negotiate directly with the defendant company, and said defendant company promised and agreed to pay the plaintiff the usual and customary price for such services in the State of Texas, which plaintiff avers to be the sum of $5,000 for obtaining such purchaser, providing such negotiation resulted in the sale of such properties. . . . Thereafter, and before the month of September, 1898, plaintiff procured one W. Q. Richards, who was ready, willing and able to purchase said prop-

erties of the defendant company, on terms satisfactory to said defendant, and put said Richards in communication with the defendant company, and afterwards, in the month of November, 1898, said defendant company sold to said W. Q. Richards, all of its said ranch and cattle at a price and on terms satisfactory to said defendant and received the purchase price therefor, and thereby became liable and promised to pay to plaintiff the sum of $5,000 at the time of said sale, and though often requested said defendant has heretofore failed and refused, and still fails and refuses to pay the same or any part thereof. . . .

"As a further cause of action, by way of third count, plaintiff says [This count is a reiteration of the first and second, except the following allegations]: Plaintiff is a private corporation, duly organized and existing under and by virtue of the laws of the State of Texas, and is and was at all times hereinafter mentioned, engaged in business as a broker in the sale and purchase of ranches in the State of Texas, and has its principal office in the city of Fort Worth, Texas, and as a means of advancing the business of its patrons and clients, publishes and distributes, and at all times hereinafter mentioned did publish and distribute a weekly newspaper in which it advertised ranches and cattle placed with it for sale, and for which it was employed to find purchasers. . . . In the month of December, 1897, said defendant Hesperian Cattle Company being desirous of selling its said ranch and cattle above mentioned, and knowing the business in which plaintiff was engaged, and plaintiff's methods and manner of transacting said business, and knowing that plaintiff published and distributed said weekly newspaper, and advertised therein all ranches and cattle placed with plaintiff for sale, or for which plaintiff was employed to procure a purchaser, employed plaintiff to advertise said properties for sale, and to find for defendant company a purchaser for said properties, with the purpose and

intent that·such purchaser should negotiate directly
with the defendant company, and said defendant com-
pany promised and agreed to pay the plaintiff the usual
and customary price for such services in the State of
Texas, which plaintiff avers to be not less than the sum
of $5,000 for obtaining such purchaser, provided that
such negotiations resulted in the sale of such properties.
.  .  .    Thereafter, and before the month of September,
1898, plaintiff, by means of the advertisements in its
said newspaper, and by other means used by plaintiff
to advance the interests of its clients and patrons, pro-
cured one W. Q. Richards, who was ready, willing and
able to purchase said properties of the defendant com-
pany, on terms satisfactory to said defendant, and put
said Richards in communication with the said defendant
company, and afterwards in the month of November,
1898, said defendant company sold to said W. Q. Rich-
ards all of its said ranch and cattle at a price and on
terms satisfactory to said defendant, and received the
purchase price therefor, and thereby became liable and
promised to pay the plaintiff the sum of $5,000 at time
of said sale, and, though often requested, said defend-
ant has heretofore failed and refused to, and still fails
and refuses to pay the same or any part thereof.  .  .  ·.

"Wherefore plaintiff brings this suit and prays
that defendants each be cited to answer this petition,
and that upon the trial hereof plaintiff have judgment
against the defendants for the sum of five thousand dol-
lars, with legal interest thereon from the month of No-
vember, 1898, to the present, and duty bound will ever
pray, etc."

Answer.

"Now come the defendants and for their answer to
plaintiff's petition in the above entitled cause, deny
each and every allegation in said petition contained.
Wherefore, defendants pray to be discharged with judg-
ment for their costs."

Evidence.

The following evidence will sufficiently indicate the nature of the questions presented in this court:

"George B. Loving, called as a witness on the part of plaintiff, being duly sworn, testified as follows:

"Direct examination by Mr. Miller.

"Q. What is your name? A. George B. Loving.

"Q. Where do you reside? A. Fort Worth, Texas. . . .

"Q. When did you next have any conversation with him [Mr. Chappell] with reference to selling this property? A. I do not remember to have had any other conversation with him until the latter part of November, 1897, when I met him at my office, and we had quite a long talk about it then. . .. .

"Q. Now, state what conversation you had in your office that evening? A. Well, he told me that he still wanted to sell the ranch and cattle, and we had quite a discussion as to the outlook in the cattle business as to values, and he wanted my opinion as to what I thought I could sell the property for, and I gave him my ideas as to the value of the cattle and the land, and the result of the conversation was that he told me he was on his way to the ranch and would return in about a week, and that he would go up and look the property over, and that on his return he hoped to make some arrangement with me to handle the property for him. About a week after that. . : . .

"Q. Proceed. A. We talked the business over and he wanted to know what I thought the property was worth, what I thought I could get for it, and I told him I thought I could sell the cattle for twenty dollars a head and, possibly, the land for as much as a dollar and fifty cents an acre. Of course, I can not give all of the conversation, because we talked for, probably, an hour. He gave me a very full description of what he had, and

he said that those prices would be satisfactory to him, and that he was satisfied they would be to the other members of the company, but he would not say definitely about that until after he had come home and consulted them. And as soon as he came home he would write me. He did not—from his conversation—he did not expect me to sell the property—

"Objected to as stating a conclusion.

"Q. Just state what he said. A. Well, he wanted me to find a buyer for the property, someone who wanted to buy property of that kind, and show it to them and then send them to him for the arrangement of details. It was understood that there would have to be some terms given on it, part cash and part on time, and wanted to know about the commission, and I told him the commission at the regular rates would be more, but that I would make it a fixed commission of $5,000. We talked about advertising the property. He thought it ought to be advertised, but he wanted it advertised in such a way that other people would not recognize that it was his ranch. I told him I would do that. He promised me that he would give me the exclusive agency for the sale of the property at Fort Worth. He impressed that on me, that he didn't want to put it into the hands of a number of other agents, especially at Fort Worth. That is about the substance of the conversation between us. . . .

"A. On December 6, 1897, he wrote me a letter from Kansas City.

"Q. Read that letter. A. The letter is as follows:

"'Kansas City, Mo., Dec. 6, 1897.
"'George B. Loving, Esq., Ft. Worth, Texas.

"'Dear Sir: Referring to the conversation I had with you recently, I wish to say that we will sell our ranch in Cottle and Foard counties at about the price we mentioned. We have about 68,000 acres of land, of which about 50,000 are patented lands. Of the re-

mainder we own about 13,000 acres, bought from the State under the act of '83, but not paid for, and about 5,000 acres of leased lands. The leased lands are on the outskirts of the pasture, so that our lands are practically solid. There is not a "nester" in the pasture and no land for them to settle on. Our lands are in two pastures, as shown by a plat on this sheet, one of about 50,000 acres and the other 20,000. They are all newly fenced with cedar and bois d'arc posts and five wire. They are well watered with springs, creeks and tanks. The grass is mostly mesquite and we have good protection. In fact it is one of the best cattle ranches, of its size, in Texas, for as you know we selected the land and bought it in 1882, when we had choice of the country. There are about 6,000 cattle in the pasture, and are, as near as I can determine, of the following ages and classes: 2,400 cows—none over eight years old; 800 two-year-old heifers—age in spring of '98; 800 two-year-old steers—age in spring of '98; 100 three-year-old steers—age in spring of '98; 900 one-year-old steers —age in spring of '98; 900 one-year-old steers—age in spring of '98; 150 Hereford bulls, young.

" 'Of course this is simply an estimate, based on our branding in 1896 and 1897. We branded 1,800 calves each year, but in case of a sale we would count the cattle. I simply give you an outline of the property, and write you that you may know the property is for sale and to look out for a buyer. While I would not fix a definite price now, there being no necessity for that until we find a prospective buyer, I believe our company would take about the price you told me you thought you could get for it, if you found parties that wanted to buy, viz.: $1.50 per acre for the land and $20 per head for the cattle. The details of the price and trade can be definitely made, also an agreement as to your commission, at any time that you think you have found a prospective buyer, or sooner if you desire it. You know

the location of the ranch, it is in Cottle and Foard counties, thirty miles due south of Quanah.

" 'Hoping to hear from you as to the prospect of making a sale, I am,          Yours truly,

" 'PHIL E. CHAPPELL.'

"Q.   Now, did you reply to that letter?   A.   Yes, sir.

"Q.   Read your reply.

" 'Ft. Worth, Texas, Dec. 29, 1897.

" 'Phil. E. Chappel, Esq., Kansas City, Mo.

" 'Dear Sir:   When your letter of the 6th was received I was absent in southern Texas.   On the 20th, almost immediately after my return, I met with an accident that has confined me to my room with a very painful and badly-crippled arm, hence the delay in answering you.   As soon as I am on my feet again, which I suppose will be within a week or ten days, I will submit your ranch proposition to two or three different parties that I have in view and advise you as to the result.   In the meantime, if you have one, I will thank you to furnish me a map of the property.   If you haven't but one, send it to me long enough to have it copied and I will return the original promptly.

" 'Awaiting your further favors, and wishing you a happy and prosperous New Year, I am,

" 'Yours truly,

" 'GEORGE B. LOVING, Manager.'

"After some correspondence about a Mr. Hudson as a purchaser, Mr. Chappell wrote the following letter to the plaintiff:

" 'Kansas City, Mo., March 12th, 1898.

" 'Geo. B. Loving, Esq., Prest., Ft. Worth, Texas.

" 'Dear Sir:   Not having heard anything further from Mr. Hudson, and there being but little prospect of a trade with him, we have concluded to withdraw our ranch from sale for a while.   This course is rendered advisable from the fact that we are making some changes in the affairs of the company which will be

consummated in sixty days. When these arrangements are made we will again offer our ranch for sale and place it in your hands. The prices, however, may be changed and readjusted to suit the changes we contemplate making.

" 'Please hold the map of the ranch and other papers until we put it on the market again. We shall still want to sell the property.

" 'Yours truly,

" 'PHIL E. CHAPPEL.'

"Q. Did you reply to that letter? A. Yes, sir.

"Q. When? A. On the 14th; as soon as I received it.

"Q. Read that letter. A.

" 'Ft. Worth, Texas, March 14, 1898.

" 'Phil E. Chappell, Prest. Hesperian Cattle Co.,

Kansas City, Mo.

" 'Dear Sir: I have yours of the 12th, advising the withdrawal of your ranch and cattle from the market, and will govern myself accordingly.

" 'I felt considerably disappointed at the weakness shown by Mr. Hudson. At the time he looked at the cattle I felt sure that we had a bona fide customer, one who meant business and one to whom we could make sale. It seems, however, that he has decided not to even make a proposition; proving very conclusively that you sized him up about right and that I was mistaken in my man.

" 'When you are again ready to offer your property I will be very glad to hear from you, and will at any and all times be ready to give the matter prompt and personal attention.

" 'Very truly yours,

" 'GEORGE B. LOVING.'

"Q. Now, did Mr. Chappell reply to that letter? A. No, sir.

"Q. When did you write him again? A. On the 31st of March.

"Q. Now, had you exhibited the ranch to any other person up to that time, except Mr. Hudson? A. No, sir; no one that had considered it. . . .

"Q. Now, prior to the time that you wrote Mr. Chappell on the 31st of March, did you have any prospective purchaser for the ranch? A. Well, as I said awhile ago, I hadn't got anyone to consider it except Mr. Hudson. . . .

"Q. When was it that you saw Mr. Richards, out of which that letter grew? A. On the 31st of March.

"Q. Where did you see him? A. In my office.

. . .

"Q. When Mr. Richards came into the office where did you see him? A. In my room, the back one.

"Q. How did he enter your room, from the hall or from the stenographer's room? A. He entered it from the front.

"Q. He went through the suite of rooms to yours? A. Yes, sir; he went through three rooms before he got to mine.

"Q. What did he say when he came in there?

"Mr. Scarritt: We object to any conversation that occurred there as incompetent, irrelevant and immaterial, and because it is already shown that the property was not in the hands of the plaintiff at that time for sale, but had been withdrawn.

"Mr. Miller: We claim that it is a conversation which led up to negotiations between Richards and Chappell which resulted in the purchase of the property by Richards. We expect to follow this up by other testimony showing that it was through the efforts of Loving that Richards was put in communication with Chappell, and the land sold, and we claim that that was a ratification of the work done by plaintiff, even if the authority had been previously withdrawn.

"Q. By Mr. Scarritt (to witness): You had not seen Mr. Chappell after that letter of March 12th was written you by him? A. No, sir.

"Q.   There was no further communication between you, except your letter of the 14th to him up to the 31st of March?   A.   No.

"Q.   In the meantime you had not seen Mr. Chappell nor received any communication from him?   A.   No.

"Q.   You never had any talk with him afterward? A.   No talk, but correspondence, I did, after the 31st.

"Q.   But not between the 12th and 31st of March? A.   No.

"The Court:   I think that letter of March 12th is an absolute withdrawal of the power of sale.

"Mr. Miller:   The plaintiff never had any power to sell.   It was employed to procure a purchaser and put him in communication with the defendant, and we seek to show that we did that.

"The Court:   I don't think there is any question that that is an unconditional withdrawal of the agency. They both recognize that in their letters.   I do not think the testimony offered is competent and the objection is sustained.

"Q.   Mr. Miller (to witness):   Now, after the date of your letter of March 31st to Mr. Chappell when did you next hear from him?   A.   April 2nd is the date of his letter.

"Q.   Do you know about when you received that letter?   A.   About the 4th.

"Q.   Read that letter.

"Mr. Scarritt:   We object to that letter because it is subsequent to the withdrawal of the agency, and as incompetent, irrelevant and immaterial; I want to make that objection to all the letters after March 31st.

"The Court:   The stenographer will note your objections to each of them.   I will hear it (them)."

. . .

After reading all of the subsequent correspondence over the objections of defendant's counsel, Mr. Miller says:

"We now desire to return to the question which was before the court at adjournment last evening; and we offer to prove by Mr. Loving what occurred between him and Mr. Richards at the interview in his office in Ft. Worth on the 31st of March, 1898, and which led up to the writing of the letter of the 31st of March, to Mr. Chappell.

"Mr. Scarritt: We object to it for the reasons already stated, that the agency of Mr. Loving had been revoked and he at that time had no authority to act for the defendant.

"The Court: I do not see anything in this subsequent correspondence that even suggests a re-employment of the plaintiff. The objection will be sustained."

The plaintiff here rested its case.

The motion for new trial was based on the exclusion of evidence offered by plaintiff, the particulars of which will be noted in the course of the opinion.

I.

The cause of action stated in the petition in the three different counts, is that the Hesperian Cattle Company employed the plaintiff company in the month of December, 1897, as its agent to procure a purchaser for its ranch and cattle in Texas and promised and agreed to pay a commission of $5,000 for so doing.

The first count alleges an express promise to pay the $5,000 for said services and the other two are in assumpsit for that sum on a *quantum meruit*.

The propriety of the action of the circuit court in excluding the evidence of plaintiff as to a conversation had by plaintiff with W. Q. Richards, who subsequently purchased defendant's ranch and cattle, depends upon the state of the evidence when that conversation was excluded.

The original employment of the appellant by respondents as its agent is found in certain letters which passed between them in December, 1897, as follows:

"Kansas City, Mo., Dec. 6, 1897.

"Geo. B. Loving, Esq., Ft. Worth, Texas.

"Dear Sir: Referring to the conversation I had with you recently I wish to say that we still want to sell our ranch in Cottle and Foard counties at about the price we mentioned. . . . The details of the price and trade can be definitely made and also the agreement as to your commission, at any time that you may think you have found a prospective buyer, or sooner if you desire it. You know the location of the ranch; it is in Cottle and Foard counties, thirty miles due south of Quanah.

"Hoping to hear from you as to the prospect of making a sale, I am,    "Yours truly,

"PHIL E. CHAPPELL."

To this letter Mr. Loving replied as follows:

"Ft. Worth, Texas, Dec. 29, 1897.

"Phil E. Chappell, Esq., Kansas City, Mo.

"Dear Sir: When your letter of the 6th was received I was absent in southern Texas. On the 20th of this month after my return I met with an accident which has confined me to my room with a very painful and badly crippled arm, hence the delay in answering you. As soon as I am on my feet again, which I suppose will be within a week or ten days, I will submit your ranch proposition to two or three different parties that I have in view and will advise you as to the result. In the meantime if you have one I will thank you to furnish me with a map of the property. If you have but one, send it to me long enough to have it copied and I will return the original promptly.

"Awaiting your further favors and wishing you a happy and prosperous New Year, I am,

"Yours truly,

"GEO. B. LOVING, Mgr."

This appointment of the appellant by the respondent continued until March 12, 1898, during which time appellant procured a Mr. Hudson to visit the property

and dickered about it a little, but nothing resulted from the negotiations. On March 12th Mr. Chappell, president of the defendant, wrote the appellant the following letter withdrawing the property from the hands of his agent:

"Kansas City, Mo., March 12, 1898.

"George B. Loving, Esq., President, Ft. Worth, Texas.

"Dear Sir: Not having heard anything further from Mr. Hudson, and there being little prospect of a trade with him, we have concluded to withdraw our ranch from sale for a while. This course is rendered advisable from the fact that we are making some changes in the plans of the company, which will be consummated in sixty days. When these arrangements are made we will again offer our ranch for sale and place it in your hands. The price, however, may be changed and readjusted to suit the changes we contemplate makin. Please hold the map of the ranch and other papers until we put it on the market again. We shall still want to sell the property.

"Yours truly,

"PHIL E. CHAPPELL."

To this the plaintiff assented in the following letter:

"Ft. Worth, Texas, March 14, 1898.

"Phil E. Chappell, Prest. Hesperian Cattle Co.

Kansas City, Mo.

"Dear Sir: I have yours of the 12th advising the withdrawal of your ranch and cattle from the market and will govern myself accordingly. I was considerably disappointed by the weakness shown by Mr. Hudson. At the time he looked at the cattle I felt sure that we had a bona fide customer, one who meant business and one to whom we could make a sale. It seems, however, that he decided not to even make a proposition, proving very conclusively that you sized him up about right and that I was mistaken in my man. When you are again ready to offer your property I will be very

glad to hear from you and will at any and all times give the matter prompt and personal attention.

"Very truly yours,

"GEO. B. LOVING."

Mr. Chappell did not reply to the letter of March 14th.

The Hesperian company insisted and the court so held, that these letters distinctly show that the agency which had been created was terminated, but plaintiff insists it was not.

How the parties themselves regarded this matter after Chappell's letter of March 12, 1898, will best appear from extracts of their subsequent correspondence. Thus on March 31, 1898, Mr. Loving wrote Chappell:

"We have just had a long talk with Mr. W. Q. Richards, who owns a ranch adjoining yours, and notwithstanding the fact that you advised us some time ago not to offer your property until you had made some changes, yet when we found Mr. Richards was on the market for a herd and ranch, we took the responsibility of presenting your ranch to him in the best light possible and strongly urged a favorable consideration at Mr. Richards' hands." . . .

In his answer to this letter written on April 7, 1898, Mr. Chappell reiterates the statement that the land is not on the market. He says:

"Your favor of 31st ult. received. Mr. William Richards called to see me about buying our land and cattle, but I told him as I had already advised you, that we had temporarily withdrawn our ranch from the market, but would probably offer it for sale again in a short time, as soon as some contemplated changes were consummated."

Again on May 20th, appellant wrote Mr. Chappell as follows:

"My recollection is that when you wrote me some time ago, suggesting that your property be withdrawn from the market for the time being, that you would

probably be ready to again offer it about this time.''

To which Mr. Chappell replied on May 23d, again reiterating that the property was not on the market and that when it should be it would be an entirely different proposition.    He says:

''Your favor of 20th received.    At the time of withdrawing our ranch from the market, we were negotiating for the purchase of 25,000 acres of additional land, adjoining our ranch in a solid body on the south.  . . . It has been our purpose when this deal was entirely closed, and which adds very greatly to the value of the ranch, to again offer the property for sale.    We are not quite ready to offer it, however, advantageously, but as soon as matters are entirely closed, I will again write you and give you a full description of the property as it now is.''

Another soliciting letter was written by appellant on July 20, 1898, as follows:

''If you will put a reasonable figure on your ranch and cattle and will give us the exclusive agency, as Mr. Wilson did, we believe we can make a reasonably speedy sale.''

To which Mr. Chappell replied on July 22d, as follows:

''We are not yet prepared or in a condition to offer our ranch for sale.''    .   .   .

And again on July 25th, appellant solicited the respondent as follows:

''When you are ready to offer the 3D ranch and cattle would be glad to hear from you, and if you will put the sale of the property in our hands exclusively at reasonable figures, believe we can make a reasonably quick sale.''

Again on August 19, 1898, appellant solicited the agency for the sale of the land, to which Mr. Chappell replied on the 24th:

''As I have already heretofore advised you, we are not offering our ranch for sale.''

We think that the fair and reasonable interpretation of these writings can lead to one conclusion only, and that is that if the Hesperian company had the right to revoke plaintiff's agency, the letter of March 12, 1898, did so and that plaintiff so understood it is shown by his reply thereto and his subsequent correspondence. The letters need only to be read to convince the impartial mind that such was the intention of defendant and such was plaintiff's judgment.

That in general a principal may determine or revoke the authority given to his agent at his own pleasure seems too plain for discussion. Since the authority is conferred by the principal of his own will and is to be executed for his own benefit, the agent can not insist upon acting when the principal has withdrawn his confidence. [State ex rel. Walker v. Walker, 88 Mo. loc. cit. 283 and 284.]

There are exceptions to the rule, but this case does not fall within any of them. Here the agency was not coupled with an interest, nor given as a part of a security or for a valuable consideration. [Hartley's Appeal, 53 Pa. St. 212; State ex rel. Walker v. Walker, supra.]

When, as in this case, a principal employs an agent or broker to sell his property for him and then withdraws his property from sale before a purchaser is found or any negotiations are productive of a control, a subsequent sale by the owner does not entitle the agent to commissions. [Levy v. Coogan, 16 Daly 141.]

And when no time is definitely agreed upon within which the sale must be made, either party is at liberty to withdraw from the arrangement, prior to the procuring of a purchaser ready and willing to enter into a contract on the principal's terms. [Sibbald v. Bethlehem Iron Co., 83 N. Y. 378; Neal v. Lehman, 11 Tex. Civ. App. 461; Bailey v. Smith, 103 Ala. 641.]

The defendant, then, having the right to revoke plaintiff's agency and as we hold, by the letter of Mr.

Chappell, of March 12, 1898, did revoke it, what if anything is there to indicate any bad faith? The only person whom plaintiff claims it had interested in the sale of the ranch was Hudson, and both plaintiff and defendant concurred that Hudson never made an offer for it. There is not the slightest pretense that plaintiff had ever seen or spoken to Richards, who subsequently bought, prior to March 31, 1898.

By no sort of reasoning can it be maintained that defendant had the purpose of defeating plaintiff's commission on a sale to Richards when it revoked plaintiff's agency March 12th, as defendant had never heard of Richards in connection with the sale of the ranch, and plaintiff in its letter of March 31, 1898, admits that its agency had terminated when it learned of Richards' desire to purchase.

Indeed, it is difficult to resist the conclusion that plaintiff recognizes that it can not recover on the original employment because counsel in urging the alleged error in excluding the conversation between Loving and Richards on March 31, 1898, says: "We claim that that was a ratification of the work done by plaintiff, even if the authority had previously been withdrawn."

It is not insisted that if the agency was revoked on March 12, 1898, there was ever any subsequent express agency created, but the claim is made that defendant is estopped by its action subsequent to the 12th of March, 1898, from asserting that said original agency was revoked and terminated.

This claim of estoppel is untenable on two grounds. First, no such issue is tendered by the pleadings. As asserted it could at most have only amounted to an estoppel *in pais* and was not pleaded, and there is nothing in the conduct of the case to show that the case was tried on that theory. [Price v. Hallett, 138 Mo. 573; Chance v. Jennings, 159 Mo. 558.]

Moreover we think the letter of September 24, 1898, does not support such contention. At that time the agency had been revoked, but the plaintiff continued to write defendant or Mr. Chappell, its president, indicating a desire to open negotiations with Richards, and it seems obvious that it occurred to Mr. Chappell that if later on when defendant had perfected its purchase of some additional twenty-five thousand acres, if it should sell to Mr. Richards, plaintiff might claim a commission, and, hence, he advised defendant that it was best for each to understand that defendant would not recognize such a claim and that plaintiff had no authority to represent defendant.

Plaintiff now says it is entitled to try the issue as to what Richards said to defendant, and that as it really sent Richards to defendant it is entitled to recover. We think there is no foundation whatever for an estoppel in the case. On the contrary, it is apparent that defendant had consistently and at all times denied there was any agency after March 12, 1898, and at no time did plaintiff assert that its contract of agency had not been revoked until after the letter of September 24, 1898, when plaintiff seems to have discovered something in the letter of defendant that indicated it was not quite certain the agency had been revoked, when defendant for the first time began to assert that the letter of March 12th did not amount to a revocation, although its letter of March 14, 1898, plainly says it was.

Another claim is advanced, to-wit, that even if the letter of March 12th was a revocation of the agency, and plaintiff did not have authority to procure and introduced Richards to defendant as a purchaser, still the acceptance by defendant of Richards as a prospective buyer with knowledge that plaintiff had sent him, operated as a *ratification* and rendered defendant liable for plaintiff's commission.

Vol 176 mo—23

This claim, like that of estoppel, is *dehors* the pleadings in the case. No such issue is raised. [Wade v. Hardy, 75 Mo. 399.]

Moreover, with defendant constantly repudiating plaintiff's right to sell its ranch, and advising it all the time and long before it entered into negotiations with Richards that it would not recognize its claim for a commission, we think that it is plain that even if pleaded the facts would not have amounted to a ratification so as to render defendant liable to plaintiff.

One can not make another his debtor in this manner. As a matter of fact the properties which defendant finally sold to Richards were so radically increased and changed that it is plain they never were in plaintiff's hands for sale.

After all, the real point in the motion for new trial and the one on which this appeal is really founded is, that the circuit court erred in not permitting plaintiff to prove the conversation which occurred between plaintiff and Richards March 31, 1898. At that time the agency had been revoked and plaintiff had written its letter acknowledging the withdrawal, and Mr. Loving testified positively that from the 14th of March until the alleged conversation there had been no further communication, either written or verbal, between him and Mr. Chappell or the defendant. Richards had never met Chappell at that time.

How, then, could a conversation between Loving, who was not an agent of defendant, and Richards a perfect stranger, at Fort Worth, Texas, in any manner affect the Hesperian Cattle Company, all of whose officers were then in Missouri?

It was so clearly inadmissible that the circuit court could not have done otherwise than to exclude it, and in so doing it obviously committed no error.

The circuit court properly refused to take off the nonsuit, and its judgment is affirmed.

All concur.