JOHN G. HOYT v. LEO R. BUDER, Appellant.—6 S. W. (2d) 947.

Division Two, February 18, 1928.

*Campbell Cummings* and *Buder & Buder* for appellant.

1158

*Jones, Hocker, Sullivan & Angert* and *Orville Zimmerman* for respondent.

1160

[black redaction bar]

HIGBEE, C.—On January 4, 1921, plaintiff sued the defendant, Leo R. Buder, in the Circuit Court of the City of St. Louis for $20,167.50, with interest from September 27, 1919, for his commission for procuring and assisting in procuring for the defendant purchasers for a tract of timber land in Dunklin County, containing 13,445 acres, belonging to the Arcadia Timber Company. The case was tried to a jury, a verdict was rendered for the plaintiff on October 31, 1924, in the sum of $26,332.03, and from a judgment thereon the defendant appealed.

The first count of the amended petition declares upon an express contract to pay the plaintiff the sum of $20,167.50 for procuring and assisting in procuring for the defendant purchasers for said tract of land at the price of $55 per acre, with interest from September 27, 1919.

The second count of the amended petition reads:

"And for another and further cause of action, the plaintiff avers that the defendant is justly indebted to plaintiff in the sum of $20,167.50 for services rendered by the plaintiff to the defendant, between January, 1919, and September, 1919, both inclusive, at the special instance and request of defendant, and for which he promised and agreed to pay, in finding, procuring and furnishing, and in aiding and assisting the defendant in finding, procuring and furnishing purchasers at the price of $55 per acre for a certain tract of land situate in Dunklin County, Missouri, comprising about 13,445 acres and then owned by Arcadia Timber Company. The purchasers so found, procured and furnished by the plaintiff were Gideon-Anderson Lumber & Mercantile Company and Hemphill Lumber Company, who purchased and paid for said properties at $55 per acre on or about September 27, 1919.

"That the reasonable value of said services of the plaintiff, the usual price and charge therefor, and the price which the defendant agreed to pay the plaintiff for the same was and is $20,167.50, no part of which has been paid, although the plaintiff demanded payment thereof from the defendant September 27, 1919, to the damage of plaintiff in the sum of $20,167.50, for which, with interest from September 27, 1919, the plaintiff prays judgment."

The amended answer, after a general denial, reads:

"For another and further defense defendant states that in January, 1919, he had an agreement with the owner of the land in question for the sale of the same at the price and sum of $55 per acre, under which agreement he was to receive $5 per acre, less 25 cents per month per acre, beginning with January 1, 1919, subject to a reservation by the owner to cancel said agreement or raise the price of said land at any time prior to the sale thereof; that subject to said verbal option so held by him defendant offered said land for sale to the plaintiff individually at $55 per acre and agreed to divide half and half with plaintiff the $5 per acre, less the carrying charge of 25 cents per month per acre received by him from the owner for making the sale.

"Defendant further states that the plaintiff, about the end of June, 1919, verbally agreed to buy the said land under the terms of such agreement, but failed and refused to carry out such agreement of purchase and repudiated his bargain.

"Defendant further states that in the month of July, 1919, the owner did raise the price of said land to $55 per acre net to it and that this defendant at once gave notice to the plaintiff."

The reply is a general denial.

The plaintiff and the defendant each produced a number of witnesses at the trial, but the following is a sufficient outline of the evidence for the purpose of this appeal. At the conclusion of all the evidence the plaintiff dismissed as to the first count of the amended petition. The defendant offered a demurrer to the evidence which was overruled.

The plaintiff testified: I have been engaged in the land business all my life. I met the defendant, Leo Buder, in 1916, and about the last of January, 1919, the defendant came to my office and talked with me about getting me to find a purchaser for a tract of timber land in Dunklin County belonging to the Arcadia Timber Company, containing 13,445 acres. Q. I will get you to tell the jury what Mr. Buder said at that time. A. Mr. Buder said that he had a contract with the Arcadia Timber Company, of which he was a member, to sell their land and had a fixed price of $55 per acre and they were to pay a commission of $5 per acre, which was to be reduced at the rate of 25 cents for each month. That reduction, he said, would be in lieu of carrying charge—the interest and taxes against the land. Q. Now, what else did he say? A. He said that if I would get in and help him to sell this land he would divide that commission—pay me one-half of it, which I understood would be one-half of five dollars, less twelve and a half cents each month reduction for my half. I told Buder I would help him and to come back the next day to go into the matter in detail. To the best of my recollection he came back the next morning. Q. What was said be-

tween you at that time? A. I told him that I had thought over the proposition and thought I could be of assistance and would be glad to take it up on the basis which he had offered.

The defendant gave me a plat of the land, showing a total of 14,105.45 acres. There were three large ditches, part of the Little River drainage system, which cut the acreage to 13,445, which, at $55 per acre, made the price the land should bring $739,495. Buder was at my office nearly every day or two from January to fall, to see how I was progressing with the sale. I went to Kennett in January or February, to get in touch with the Hemphill Lumber Company, and there saw Mr. C. A. Hemphill, and Mr. W. D. Lasswell who I thought was interested in the Hemphill Lumber Company. The Arcadia land lay about two and a half miles east of Kennett. Lasswell and I went to see Mr. Hemphill and talked with him, but Hemphill said he was not in a position to take on any more land as he had just bought 4000 acres. I returned to St. Louis and went to see Mr. Anderson, connected with the Gideon-Anderson Lumber & Mercantile Company. The land in question was a fine body of virgin timber, which had been swampy, but was now drained by the Little River Drainage District. I endeavored to interest Anderson and Hemphill in the purchase of this land and many others; continued negotiations with Anderson. I told Anderson of this commission that was offered me for the sale of the land and told him if he would buy the land I would be willing to give him a portion of the commission. From that time they began to figure about buying the land and timber. I then agreed to buy a portion of the land myself, because the Buders insisted upon the land being sold in one body. Mr. Anderson suggested parceling it out. Anderson told me he had conversations with Hemphill, and Hemphill told Anderson he would take part of the land. Negotiations were almost at a head for a month or two, but were finally brought to a head in September, 1919. Buder was present at the last day when they were bringing up the subject of the deal on mortgages. Anderson said he would take the land on the east side of the ditch, a little over 8000 acres, and pay all cash, over $400,000. Mr. Buder had a contract made out for Mr. Hemphill to take the balance of the land. Hemphill entered into this contract for the land on the west side of the ditch. The deal was closed. Anderson, Hemphill and the defendant were present. During all the negotiations the defendant kept constantly telling me that "we were losing money by not hurrying up the closing up of this business and asking me if I had seen this man or that man. You knew there is 25 cents a month of our commissions getting off every month that goes by and this land is unsold." I said, "I know it, but this is a big deal; you can't get these people to move so fast as you would like to have them."

Plaintiff testified as to his experience as a broker and that he had sold a great deal of land and timber and that he was interested in several corporations owning large tracts of land and buying and selling them, and that was the only way he had of making a living; that he asked Mr. Buder for his commission about the day the trade was closed and he never paid any part of the commission.

On inquiry by the court the defendant admitted that the property west of the ditch was sold to the Hemphill Lumber Company, and that east of the ditch to the Gideon-Anderson Lumber Company; all sold and conveyed and paid for on the basis of 13,445 acres.

On cross-examination:

"Q. Now, when he called on you, wasn't this what he did: He said, 'Mr. Hoyt, you want this land and I got a price of $55 per acre, which is the price to everyone, but if I sell it I could get $5 per acre less 25 cents for each month, beginning January 1st until it is sold, subject to its being handled prior to my making the sale?' Isn't that what he told you? A. The majority of it is, yes, sir. But he asked me, instead of saying that I wanted the land, he said he wanted me to get in and help him sell the land, and he said he had this proposition, and that if I would get in and help him procure a buyer, or if I wanted to buy it myself, or anything, that I could have half of the commission which was fixed by the company.

"Q. Half of $5 per acre, which he was to get? A. Yes; he was willing to divide it up with me if I would help procure a purchaser.

"Q. In other words, you were to get half— A. (Interrupting) He said he knew I could do it, because I knew the people; that I had entree, and that he had worked on the thing so long himself it just did not seem as if anyone took him seriously.

"Q. And didn't you state at that time that if you could find a buyer for the timber you would take the land? A. No, sir.

"Q. You did not say that? A. No.

"Q. Now, you say he told you then that if you bought the land, or sold it to someone else, he would give you one-half of what he got; is that right? A. No, he said he would give me half of $5 per acre, less the carrying charge.

"Q. That if he sold—if you bought it or sold it to someone else? A. Yes; if I assisted in selling the land in any way, shape or manner he would divide with me. I did not buy the land. In a conversation with Leo Buder on Sunday about July 1, I said I would take it; on Monday the matter was not arranged and I did not buy it."

There was much evidence tending to prove that plaintiff orally contracted with defendant to buy the land, but as no point is made on this oral contract it will not be further noticed, so far as avoidable.

Plaintiff further testified: There was never a word said about cutting off the commission till the sale was made. Then he said, "You didn't take it while you had a chance and there isn't any commission." I was never told that the price had been raised immediately after I failed to carry out the purchase, and I at no time after July 1 sought to have $5 per acre commission reinstated. I talked with a lot of people about buying the timber and about buying the land. I knew it had to be split up. There was no one willing to go into such a large transaction. I thought one time Mr. Anderson would buy it all, but he said it was too large a transaction. He said he could use part of the land or part of the timber. I had several talks with Hemphill and was at his office once at Kennett and sat in on transactions between Hemphill and Anderson. In August and September when they agreed to buy the land I sat in the last conference when they were closing the deal. Anderson kicked out of the transaction the same as I had and paid cash instead of accepting the terms. I did not try to block the deal. Leo did not tell me at that time that I had nothing to do with it, or that it had all been agreed to between Anderson and Hemphill and the company and himself and Mr. Wenger and it will have to stand that way or it won't go through. That is wrong. Mr. Anderson was my client. I represented certain things to him and I proposed to see they were carried out that way and when they could not Mr. Anderson made a different deal to pay you people nearly half a million dollars in cash. There were unreasonable things in the deed of trust or contract, whatever it was.

On re-direct examination, plaintiff testified that he was acquainted with the reasonable value of selling timber lands; ten per cent is what most brokers get; that is a fair commission on deals of this kind. The usual proportion that brokers charged for assisting other brokers in the sale of land in 1919 for such assistance was one-half of the compensation.

William P. Anderson testified: I lived in St. Louis County and was in the lumber business in 1919 under the name of the Gideon-Anderson Lumber & Mercantile Company and had offices in the Wright or Arcade Building. I had negotiations with John G. Hoyt relating to the sale of the Arcadia Lumber Company; they commenced in February and continued up to the sale of this land in September, 1919. I was president of my company, and J. A. Hemphill was president of the Hemphill Company. Hoyt, Hemphill and I figured together. Hoyt and I figured on it from February and Hemphill came in later, probably in May or June. Hoyt came to see me in February, but I was not in a mood to buy. Hoyt came about a dozen times and finally we figured on buying it together; that was for the timber, and we asked Melson of the Missouri State Life to go in on it. During these negotiations Hoyt and I frequently talked with Leo Buder.

Hoyt was not present during these interviews up to the last few days of the deal along in September. Leo came to see me at various times. Hoyt talked with me and Leo the last few days before the deal was made. From the time I became interested these negotiations looking to the purchase of the land continued up to the time I bought it.

The defendant, Leo R. Buder, testified: I had dealings with the plaintiff, but not in January. I offered to sell him the land of the Arcadia Timber Company at $55 per acre. I told him I had an opportunity to make $5 per acre out of the land, less 25 cents for each month, beginning with January 1, 1919, on account of the carrying charge, and if he would buy the land I would share with him what I got out of it. I urged Hoyt to buy and told him this agreement I had with the company was subject to be canceled at any time, and the price was subject to be raised at any time. Hoyt said he would take or make an offer to take it in a short time. I called on Hoyt between that time and the latter part of June because I thought he was bringing about a sale of the land. Hoyt told me he was trying to sell the timber. I told Hoyt he should not try to sell the timber before he bought the land, because I had no such contract with the company. I had negotiated with Mr. Lasswell the latter part of June the same kind of an agreement. On June 27th, we, Lasswell and I, agreed upon the terms and conditions of the sale and we had the papers drawn up and I was to go to Kennett on Sunday night and they would close the deal on Monday. I did not go down because on Saturday morning, June 28th, Hoyt came to my office and wanted to know why I would not let him have the land.

Witness related the negotiations on Sunday, resulting in an oral contract that Hoyt would take the land. Witness went to Hoyt's office the day following and Hoyt declined to take the land. Witness continued: I did not report to the company that he would not take the land because I intended to see him again. I saw him on July 1. He again refused to carry out the contract and I reported to the office of the Arcadia Timber Company that Hoyt had backed down on the deal. The president of the company said, from now on, Leo, there is no chance for you to make anything out of this land. Fifty-five dollars is the net price to the company; the price to you is the same as any one else. My brother, G. A. Buder, is president of the company. I went back that afternoon, Tuesday, and told Hoyt that the arrangement he and I had regarding this deal is off. I told him the price had been raised to $55 net to the company; that I was sorry he did not take the land, but any arrangement you and I had regarding the sharing of commissions which I was to receive is off. The company has canceled it with me and therefore there is no chance for me to make anything out of it from now on. That was

Tuesday, July 1st. Hoyt came to my office in the latter part of July and asked me to get him authority to sell the land and I told him that could not be done and the only way was for him to buy it. In August Hoyt asked me to get my brothers to reinstate the commission business. I said there is no chance to do that since you refused to carry out that purchase of the property on July 1st or June 30th.

I dealt with the Hemphill Lumber Company and W. D. Lasswell before I knew Hoyt. Lasswell was trying to form a syndicate to buy this timber land. Hoyt was to be one of the purchasers. I never had any deal with Hoyt whereby Hoyt was to sell the property for me and my dealings with Hoyt were at all times as that of a purchaser and these deals went back to February, 1916. I had been dealing with Mr. Anderson on the land in question as early as the latter part of 1914. I could not interest him prior to 1916. Anderson made me several offers on the tract after that. I met Anderson about the 1st of July, when Anderson said if I would get a buyer for the land west of the ditch he would take the part east of the ditch if the parties you get will absorb $5 per acre of the cost of the acreage east of the ditch. I spoke to Hoyt and Hemphill about it; Hoyt said I will do that myself if Anderson will absorb $5 of that part east of the ditch. I talked with Hemphill and from that time on Hemphill was interested in buying the land. After it got to a point where it was materializing, Anderson, Hemphill and I met frequently. Hoyt was not present at any of these meetings; he did nothing whatsoever to assist in making this deal at that time. In my opinion he was trying to kill the deal. We had come to terms, but there was a separate agreement that Hemphill and Anderson had to work out, and until that was done we could not draw up the papers. Hoyt at no time demanded a commission and I first learned of his wanting something when I got a letter from Jones & Hocker in February, 1920. I met Hoyt on the street and asked why he was trying to get a commission out of me; that he had nothing coming out of the deal and that the commission had been canceled and withdrawn because of his failure to carry out his contract when he bought the land; that if he did have anything coming he had it coming from the company and not from me. Hoyt said, "Tell it to the judge." I had repeatedly warned Hoyt that the company was likely to raise the price. After he refused to carry out his deal I told him that his agreement with the company had been canceled.

On cross-examination witness testified: I was a director and my brother, G. A. Buder, was president and Oscar Buder was vice-president and secretary of the Arcadia Timber Company. As far as I know no one else had any stock in the company. The capital stock was $300,000. I had a quarter of it. My brothers held the

remainder of it. Oscar is the oldest and G. A. is the youngest. They had meetings of the board of directors. I was anxious to get rid of the land; that is the way I got the $50 price. I said I was trying to work up a deal and they said they would let me have that price, "but you will have to pay 25 cents a month carrying charge, but this privilege is subject to withdrawal at any time." I was always trying to sell the land because the taxes were getting too heavy for me to carry my end; my brothers were not anxious to sell. My brothers were willing to sell and I thought I ought to have something out of it after I had worked up the deal and they gave me that privilege. They did not know I was dividing with Hoyt until Hoyt threw down the deal and I then told them about it. The land was sold for $55 per acre; there were 14,105 acres less 660 odd acres for the ditch. Lasswell knew of the agreement and I told him if he brought about a sale I would give him a part of what I was getting. I had no agreement with Hoyt prior to June 29 to sell the land. I had an agreement with him to share with him one-half what I got, which was to be $5 per acre less the carrying charge of 25 cents per acre for each month which expired, from January 1, which in that instance would have been $1.50 off of $5, which would have been $3.50 if it had not gone into July, and that agreement was subject to cancellation.

Oscar E. Buder, attorney for the defendant, testified that he was one of the officers and directors of the Arcadia Timber Company; that Mr. O. J. Stocke and one of the Fuerbackers were shareholders in the company and directors; that there were five directors.

The appellant contends that on the evidence the plaintiff and the defendant were joint adventurers; that count two is not one on *quantum meruit;* that the proof did not support the petition; that the demurrer at the close of the evidence should have been sustained, and that the contract developed at the trial will control and limit the amount and character of the recovery.

I. It is earnestly insisted that the second count declares upon an express contract and not on a *quantum meruit,* and that in an action upon an express contract a recovery cannot be had as on a *quantum meruit,* citing Gillham v. Met. St. Ry. Co., 282 Mo. 131, 221 S. W. 1. Appellant insists that the averment, "that the reasonable value of said services of the plaintiff, the usual price and charge therefor, *and the price which the defendant agreed to pay the plaintiff for the same* was and is $20,167.50," is a declaration on an express contract and not on *quantum meruit.*

If this were an action on an express contract the allegation of the reasonable value of the services would have no place in the petition. The averment, in substance, is that the defendant agreed to pay

the reasonable value of the services, and that such value is $20,167.50.

*Quantum meruit,* "as much as he has deserved," is a count in an action grounded on a promise that the defendant would pay to the plaintiff for his services as much as he should deserve. [Webster's New Int. Dict.] The law implies the promise; it is a legal fiction. "In such case the plaintiff may suggest in his declaration that the defendant promised to pay him as much as he reasonably deserved, and then aver that his trouble was worth such a sum of money, which the defendant has omitted to pay. This is called an *assumpsit* on a *quantum meruit.*" [Bouvier's Law Dict.; 32 Cyc. 1285.] The averment in this respect is quite similar to that in Stanley v. Whitlow, 181 Mo. App. l. c. 464, 168 S. W. 840, where Judge TRIMBLE said:

"The phrase 'which the defendants agreed to pay' in the closing part of the petition was not an allegation that they expressly and specifically agreed to pay any specified sum. It merely means that the defendants agreed to pay the reasonable value of the services and the agreement to pay was made as set forth in the petition, that is, by requesting plaintiff to act. Taken as a whole the petition sought recovery as upon a *quantum meruit* and not upon an express or explicit contract." See also Klein v. Terminal Ry. Assn., 268 S. W. 661 (3), 663, col. 2; Glover v. Henderson, 120 Mo. 367, 375.

The first count clearly declared upon an express contract. It is unreasonable to assume that the pleader would in the second count also declare upon an express contract. We think there can be no question that the second count is an action upon a *quantum meruit.* Where, as in the instant case, the contract has been fully performed and nothing remains to be done except payment, the plaintiff may waive the contract and sue on a *quantum meruit* and use the contract as a basis for computing the amount due. [Oaks v. Short, 292 S. W. 738, 740 (3) and cases cited; Moore v. Gaus & Sons Mfg. Co., 113 Mo. l. c. 107, 20 S. W. 975; Cozad v. Elam, 115 Mo. App. l. c. 139, 140, 91 S. W. 434; Henderson v. Mace, 64 Mo. App. 393, 397; Daniels v. McDaniels, 184 Mo. App. 354, 171 S. W. 14; 13 C. J. 243; 40 Cyc. 2935.]

II. Appellant's main contention is that the contract between plaintiff and defendant was one of joint adventure. The printed argument of appellant's counsel is addressed solely to that theory.

There can be no question that there is substantial evidence that the plaintiff was a broker and had been a dealer in large tracts of land; that the defendant and his brothers had been for years trying to sell their land, but were unable to interest any one able to buy so

large a body of land. The defendant told plaintiff he knew plaintiff could do it, that is, find a purchaser, because plaintiff knew the people and had the entree; that he, the defendant, had worked on the thing so long himself that it just did not seem as if any one took him seriously. "Q. Now, you say he, the defendant, told you then that if you bought the land, or sold it to some one else, he would give you one-half of what he got, is that right? A. No; he said he would give me half of $5 per acre, less the carrying charge."

The evidence for the plaintiff shows that in a little while plaintiff succeeded in getting Anderson and Hemphill interested in the purchase of the land; they and plaintiff began negotiations with the defendant which continued until September 27, 1919, when their two companies closed the deal with the defendant, the large tract of land was conveyed to them and the purchase price, nearly three-quarters of a million dollars, was paid to the Arcadia Timber Company.

Appellant's learned counsel cite Plummer v. Trost, 81 Mo. 425, where it was held (quoting syl. 2): "An agreement between the owner of a farm and another, by which the latter and his wife in conjunction with the owner shall work together on the farm, the proceeds of their joint work and labors to be shared together, is a contract of partnership. It is not a contract for hire and wages, and cannot be sued on as such."

On page 430, Judge PHILLIPS said:

"Was this arrangement anything more or less than a partnership between the defendant and husband for farming together and sharing the proceeds according to labor and production? How is it permissible for the wife in the form of action adopted in this case to recover in view of such a contract? The action is for a *quantum meruit* for the reasonable value of her services. It is true a party may sue on a *quantum meruit*, and the disclosure at the trial of a specific contract will not defeat his action. [Mansur v. Betts, 80 Mo. 651.] But the contract when developed on the trial will control and limit the amount and character of the recovery."

In 33 Corpus Juris, 847, it is said: "*Profit sharing not conclusive.* The fact that the contract provides for a sharing of the profits, while an important factor in determining the character of the contract, does not of itself make it one of joint adventure. There must be something more, some active participation in the enterprise; some control over the subject-matter thereof or property engaged therein."

Plummer v. Trost, supra, relied on by appellant, involved an agreement jointly to operate a farm and divide the profits, and is in no respect in point. Here the appellant said to the plaintiff I have a contract for $5 an acre if I sell this Arcadia land and if you find a purchaser I will give you one-half of it. The plaintiff and the de-

fendant worked separately to find a purchaser. In fact, appellant's testimony is that he had begun negotiations with Anderson and Hemphill before he knew Hoyt, and that Hoyt was not instrumental in making the deal with them; there was no cooperation between them in making the deal. Appellant's testimony at the trial is fatal to his contention that he and Hoyt were joint adventurers in the sale of the land.

III. There is ample testimony to support the averments of the petition and the verdict. A broker employed to negotiate a transaction frequently calls in the aid of another broker with whom he agrees to divide his commission. In such case the latter is entitled to his commission if he performs his contract. [9 C. J. 584; Coffman v. Dyas Realty Co., 176 Mo. App. 692 (9), 704; Oaks v. Short, 292 S. W. 738, 740 (3).] One who employs a broker to find a purchaser is usually liable for compensation regardless of the nature of his interest in the property and regardless of whether or not he has any interest in it whatsoever. .[9 C. J. 586; Enright v. Ford, 106 Mo. App. 705, 80 S. W. 291; Neenan v. Donoghue, 50 Mo. 493, 495; Norman y. Vandenberg, 157 Mo. App. 488, 138 S. W. 47.] And the jury having found on substantial evidence that the plaintiff was instrumental in effecting the sale of the land, "no sort of artifice, deceit or fraud will deprive him of his commission." [Corder v. O'Neill, 176 Mo. l. c. 438, 75 S. W. 764.]

IV. Plaintiff's first instruction reads:

"The court instructs the jury that if you believe and find from the evidence that on or about the 31st day of January, 1919, the defendant represented to the plaintiff that he had for sale about 13,445 acres of land in Dunklin County, Missouri, belonging to the Arcadia Timber Company, at the price of $55 per acre, and also had an agreement with said Arcadia Timber Company by which he should receive as a commission for selling said land the sum of $5 per acre, less a carrying charge of 25 cents per acre for each month from said time until a sale should be made; and if you further believe and find from the evidence that the defendant stated to the plaintiff that if the plaintiff would assist the defendant in finding a purchaser for said lands the defendant would give the plaintiff one-half of the aforesaid commission; and if you further believe and find from the evidence that thereafter, in pursuance of said proposition of defendant, if any, the plaintiff undertook to find a purchaser or purchasers for said lands, and that the plaintiff did interest W. P. Anderson, president of the Gideon-Anderson Lumber & Mercantile Company, and J. A. Hemphill, president of the Hemphill Lumber Company, in the pur-

chase of said lands; and if you find from the evidence that as a result of plaintiff's efforts, if any, said lands were thereafter sold and conveyed to said Gideon-Anderson Lumber & Mercantile Company and Hemphill Lumber Company, and that the plaintiff was the procuring cause of such sale; then if you so find and believe, your verdict must be for the plaintiff for such sum as you find from the evidence to be the fair and reasonable value of plaintiff's said services, not exceeding, however, in amount the sum of $20,167.50 sued for; and if you so find for the plaintiff you may also allow the plaintiff interest on the sum so found, at the rate of six per cent per annum from the date which you find from the evidence the plaintiff demanded payment from the defendant, if you find such demand was made.''

Appellant assigns error in the giving of this instruction, that it is confusing in starting out on an express contract and ending in the fair and reasonable value of plaintiff's services and that it intimated to the jury that the amount sued for was the fair and proper measure of the value of plaintiff's services. There is no merit in this criticism. The instruction properly advised the jury in effect that if they found the issues for the plaintiff they should find for him the reasonable value of his services, not exceeding, however, the sum sued for.

V. Appellant complains of the refusal to give his requested Instruction No. 10. It reads:

''The court instructs the jury that if you find and believe from the evidence that defendant in January, 1919, told plaintiff that he had a price on the land in question of fifty-five dollars an acre, whereunder he would get five dollars per acre on the sale thereof, less twenty-five cents per acre per month carrying charges, subject to the price being raised at any time before a sale was made, and if you further find and believe from the evidence that in the month of July, 1919, the price was changed *and that by reason thereof the defendant received no part of the sale price,* if you find the property was subsequently sold, then plaintiff cannot recover and your verdict will be for the defendant.''

This instruction was covered by the defendant's instructions numbered 3, 4 and 5, given by the court, except the words italicized.

The defendant's answer is a general denial. It does not admit the employment of the plaintiff to find a purchaser for the land and seeks to avoid it on the ground that there was a revocation of his employment. In order to make this defense, defendant should admit the employment and avoid it by pleading a revocation. Such a defense is in the nature of a confession and avoidance. Moreover, defendant's Instruction 10 was properly refused because it required a finding for the defendant, if the defendant received no part of the sale price.

Appellant contends that it was necessary under any view of the case for the jury to have found that the plaintiff received a commission or at least a direct pecuniary benefit. We have seen that if the defendant employed plaintiff as a broker to assist in finding a purchaser for the land and he performed his part of the contract, the defendant is liable on his contract whether he had any interest in the land or received a commission for the sale of the land or not. The instruction was properly refused.

VI. Appellant complains of Instruction No. 7, given by the court on its own motion. It reads:

"The court instructs the jury that the burden of proof is on the plaintiff to establish by the preponderance or greater weight of the evidence the facts necessary to a verdict in his favor under these instructions.

"By the terms 'burden of proof' and 'preponderance of the evidence,' the court intends no reference to the number of witnesses testifying concerning any fact, or upon any issue in the case, but simply uses those terms by way of briefly expressing the rule of law, which is, that unless the evidence (as to such issue) appears in your judgment to preponderate or outweigh, in respect to its credibility, in favor of the party to this action on whom the burden of proof (as to such issue) rests, then you should find against such party on said issue."

This is the usual form of instruction given on the burden of proof. It is unlike the instruction given in Trautmann v. Trautmann, 300 Mo. 323, 254 S. W. 286, which "in effect told the jury that the number of witnesses testifying upon any given question was of no consequence and was not to be considered."

No error is assigned as to the giving or refusal of other instructions.

VII. In one point of appellant's brief he complains of error in "not permitting the examination of the *defendant* and *defendant's* witness Hankins in the manner followed by defendant's counsel by directing attention to contrary statements made by them in their respective depositions." Appellant refers to page 25 of the abstract of the record where the court sustained an objection to a question asked plaintiff on cross-examination as to certain answers made by plaintiff in his deposition taken in the case. When the objection to the question was sustained defendant's counsel not only saved no exception but said: "All right." The record shows that Mr. Hankins testified as a witness for the plaintiff, that he was cross-examined by the appellant and that the appellant offered Mr. Hankins' deposition in evidence and

read portions thereof in evidence, and that no exception was saved as to the ruling of the court in that respect.

VIII. Appellant insists there was no evidence of the reasonable value of plaintiff's services in finding a purchaser other than that of plaintiff and that in the evidence he was not qualified to testify relative thereto. The record shows that plaintiff testified as to his experience as a broker in selling land and that his testimony in that respect went in without objection.

IX. Appellant contends that the verdict is excessive and that the jury erred in its reckoning of the interest. The verdict was rendered five years, one month and four days after the commission became due and payable. Deducting the carrying charge of 25 cents per month for eight months, leaves the total commission on the sale of the land at $3 per acre. One-half of this on 13,445 acres would be $20,167.50. Interest on this sum from September 27, 1919, to the date of the verdict at six per cent is $6050.25. This makes the amount of the verdict. The laborer is worthy of his hire.

The case was fairly tried, and the judgment is affirmed. *Davis* and *Henwood, CC.*, concur.

PER CURIAM:—The foregoing opinion by HIGBEE, C., is adopted as the opinion of the court. All of the judges concur.