**E. A. MABES AND COMPANY, Inc.,**
A Corporation, Respondent,

v.

**Harry FISHMAN, Appellant,**

Helen Eder, Theodore Eder, Louis Fishman
and Adell Fishman, Defendants.

No. 22229.

Kansas City Court of Appeals. Missouri.

Oct. 3, 1955.

Marcy K. Brown, Jr., Kansas City, for appellant.

Joseph S. Levy, Paul Margolis, Jr., Kansas City, Granoff, Levy & Craig, Kansas City, of counsel, for respondent.

DEW, Presiding Judge.

Plaintiff brought this action to recover a real estate agent's commission for the sale of a building in Kansas City, Missouri. The petition is in two counts. At the trial plaintiff dismissed its second count and dismissed as to all of the defendants except appellant Harry Fishman. A verdict was rendered in favor of the plaintiff on its first count against defendant Harry Fishman for $3,250. Judgment was entered accordingly and said defendant has appealed.

The substance of Count 1 of the petition is that the plaintiff is a duly licensed real estate agent; that defendant Harry Fishman and other defendants, acting jointly and severally and as agents for each other, listed the property owned by them and known as the Studio Building, with the plaintiff for sale; that the legal title was carried in the name of defendant Helen Eder; that they agreed to pay plaintiff the legal commission for such services as pro-

vided by the rules of the Kansas City Real Estate Board upon the procurement of a purchaser for the property at a price of $65,000, free and clear of encumbrances; that plaintiff produced one Josephine E. Fluke, who was ready, able and willing to purchase the property on the terms satisfactory to the defendants, to-wit, $65,000 cash, less an unpaid amount on a first deed of trust to be assumed by the buyer; that plaintiff obtained a contract signed by said purchaser on said terms and a deposit of $5,000 on May 5, 1952; that plaintiff submitted the above contract to defendant and made a change therein requested by defendant respecting compliance with the OPA regulations, prepared a new contract with such changes made, obtained the signature thereto of the purchaser and a new deposit of $5,000 under said changed contract, in behalf of the defendants; that defendants refused to convey the property to said Josephine E. Fluke and refused to pay the plaintiff the commission of $3,250, or 5 percent of the sale price, as agreed. The answer was in the nature of a general denial of the material allegations of the petition.

Defendant's points on the appeal are that there is no liability on his part to pay the plaintiff a commission because he at all times disclosed to the plaintiff the name of his principal in matters pertaining to the property; that there was insufficient evidence of employment of the plaintiff to procure a buyer; that the contract obtained by the plaintiff was never accepted by the title owner, its terms were never determined by the owner and it is insufficient as a basis for recovery of a commission by the plaintiff; that since there was no acceptance of the contract by defendant personally or as agent for Helen Eder, the title owner, defendant is not liable for a commission; that there was no proof that a purchaser was obtained who was ready, able and willing to purchase the property which was an element of the plaintiff's action for which he had the burden of proof; that the court erred in giving plaintiff's Instruction 1.

The plaintiff bases his contention that defendant is liable on the principle that one who employs a broker to find a purchaser of real estate on certain terms is liable to the broker for a commission after such a purchaser be so found, whatever interest, if any at all, such employer may have in the property; that having accepted the purchaser, the seller becomes liable for the commission, and if the purchaser be ready, able and willing to purchase the property upon the terms fixed by the seller, the commission is due the broker whether or not the sale is consummated.

The substance of the plaintiff's evidence was that its president, Mr. Mabes, was duly licensed as a real estate broker in this state, and his place of business had been at the same location in the Commerce Building for 31 years. Mr. Mabes had known the defendant Harry Fishman for ten years and had previously done business with him. In the spring of 1952, the defendant called Mr. Mabes at the plaintiff's office and sought the plaintiff's aid in selling the Studio Building, located at 9th and Locust Streets in Kansas City, Missouri. No written agreement of agency was entered into. The customary commission charged by members of the Missouri Real Estate Board is 5 percent of the sale price of property under $100,000. Mr. Mabes told defendant he would send a salesman, Mr. Richardson, to get all the necessary information regarding the property. Mr. Richardson, who himself was a real estate broker since 1923 and operating under a state license as such, and who had known the defendant for ten years and had done business with him, called on the defendant the next day and obtained from his office a detailed statement regarding the rental income, mortgage data and operating information pertaining to the property. The witness made copies of this statement at his office, which statement was later shown to defendant and approved by him.

According to plaintiff's evidence the defendant set the price of $70,000 and Mr. Mabes decided to advertise the property at $80,000 to allow a spread. When defendant set the price at $70,000 he, in the presence of Mr. Richardson, stated that the plaintiff was to get a commission of 5 percent.

Plaintiff advertised the property several times in The Kansas City Star. Many inquiries were received, which were turned over to the plaintiff's salesmen. With defendant's consent they showed the building to several prospects. Many conversations were then had between the defendant and plaintiff's agents and Mr. Mabes. Defendant told Mr. Kroh, one of the plaintiff's salesmen assigned to the property, that he was going to California, and would take $65,000 for the property.

Plaintiff and its agents then showed the property to one Barney Cinnamon. He became interested. They presented Mr. Cinnamon with a copy of the operating statement obtained from the defendant's office and approved by the defendant, and Mr. Cinnamon decided to make the purchase at the price of $65,000. Mr. Cinnamon was the owner of an apartment building in Kansas City, and also owned another site where a building had burned. He executed and delivered to the plaintiff his check for $5,000 as a deposit on the purchase. A contract was then prepared by one of plaintiff's salesmen.

Mr. Cinnamon requested that the contract be made in the name of Josephine E. Fluke, as the purchaser, a straw party, whom he had always used in the purchase of real estate. She was manager of the apartment building at 13th and Pennsylvania Avenue, owned by Mr. Cinnamon. The contract was so prepared and on May 5, 1952, Mr. Cinnamon and plaintiff's salesman drove to the apartment and obtained Mrs. Fluke's signature to it. Mr. Kroh then took the signed contract to defendant at the Victoria Hotel of which defendant was manager.

When the contract signed by Mrs. Fluke was presented to defendant and he was told that plaintiff had obtained a check for $5,000 as a deposit on the contract, defendant instructed Kroh to make the contract in the name of Helen Eder, his niece, as the seller, who was holder of the record title, and said that he, the defendant, owned an unrecorded half interest in the property. He was told that $5,000 had been paid as a deposit

on the contract. The next day the defendant objected to a clause in the contract which asserted full compliance with the OPA pertaining to the rentals. He made no objection to the name of Mrs. Fluke as the purchaser. He did not ask for the deposit held by the plaintiff. He made no other objection to the contract except the paragraph in reference to the rental regulations. Kroh suggested that he meet with plaintiff's salesmen at the office of Mr. Cinnamon's attorney and discuss the clause objected to. The defendant accordingly met with Kroh, Richardson and Cinnamon at the attorney's office. After a discussion, the attorney announced that his client would waive the clause and with his pen struck it out. The defendant then said the contract should be rewritten and a new contract signed. Thereupon plaintiff's salesman rewrote the contract, deleting the clause objected to and, accompanied by Mr. Cinnamon, obtained the signature of Mrs. Fluke on the new contract. They then drove to the Victoria Hotel where Mr. Cinnamon and defendant talked for a quarter of an hour and a copy of the new contract was given the defendant and a copy to Mr. Cinnamon. Defendant remarked: "Don't worry, you got a sale", a statement which he made several times thereafter upon inquiries from the plaintiff. He later said the deal was being delayed because his niece was coming from California.

Information reached the plaintiff that defendant was showing the property to someone else. When asked about this he replied: "What are you worrying about? The contract will be signed." Later he said: "I am not showing the property to anybody else and do not intend to." When Mr. Richardson, plaintiff's salesman, first reported orally to defendant that Mr. Cinnamon had made his offer of $65,000 and before the first contract had been prepared, defendant said that the plaintiff would receive a 5 percent commission on any sale at his price. He said he did not know whether his partner would accept the offer or not, but that he would; that he then put in a long distance call in Richard-

son's presence and told the latter that his niece said she would accept the $65,000. Richardson suggested she send a telegram to that effect and defendant made that request over the telephone. The next day Mr. Mabes called the defendant's office and defendant had a telegram but did not read it aloud, but said: "We have got the acceptance on the deal. Go ahead and get your $5,000 up and the contract."

After delivering the second signed contract to defendant, the plaintiff's representative called on him repeatedly and asked him to explain the delay and "At least a dozen of times" he said: "Do not worry, you have got a sale". "What are you worrying about? The contract will be signed". He several times denied that he was showing the property to anyone else.

Richardson testified that at the conference at the office of Mr. Cinnamon's attorney when the clause objected to by defendant was deleted, and a new contract was written according to his request, Mr. Cinnamon asked the defendant if he cared who took the title and defendant said: "I don't care. All I want is the money." Later defendant told Richardson that he had sent the second contract by air mail special delivery to his niece in California for her signature. At a later time defendant telephoned the witness and asked if the $5,000 deposit check had been cashed and being told that it was, said: "Now, that price was $65,000 wasn't it?" Witness replied: "Certainly, now, it was; what are you asking me for?" Defendant said: "That was all cash above the loan, wasn't it?" Witness answered: "That is correct". Witness said the defendant later told him: "Don't worry, your deal is going to go through—I have been informed that Helen Eder and her husband are on the way to Kansas City. They are driving through. * * * They should be here most any time. They are going to Toledo and stop here and they will sign the contracts when they come through." Meanwhile, defendant had furnished plaintiff a statement of the mortgage balance to the exact date, the rental status of each apartment, and the amount of the insurance premiums and other records of the operation of the building.

While reading The Daily Record, a legal newspaper, Mr. Mabes discovered that the property had just been deeded to someone else. He confronted the defendant with this information. Defendant denied that the sale had been made and said that the Cinnamon deal would be carried out. Later, Mr. Mabes refunded to Mr. Cinnamon the $5,000 deposit that had been paid.

In behalf of the defendant, Mr. Sherrill Friedman testified that in 1951 he began negotiations with the defendant for the purchase of the Studio Building; that defendant had difficulty with the rent control and the witness did not consummate any deal; that defendant made several improvements and on May 8, 1952, witness closed the deal for himself and several associates through Dan Boyle, their straw party; that they paid $65,000 for the property, assuming the mortgage as a part of the purchase price, making a deposit of $5,000 on the contract and the defendant agreed to pay the commission to the real estate agent, one Mr. Magady. The contract was signed by Helen Eder and her husband "By Harry Fishman", and by him individually. Thereafter, the interests of the purchasers were distributed by conveyances to them.

Testifying in his own behalf, defendant denied that he had known about any contract with Mr. Cinnamon until Richardson presented one to him one evening at the Victoria Hotel and "I will not use the words—what I said, I said 'I don't want that contract' "; that he refused to submit it to Mrs. Eder and "turned it down flat"; that Richardson picked up the telephone and called Mr. Levy, attorney, and arranged a meeting in the latter's office for the next morning; that witness attended that meeting and there found Mr. Kroh, Mr. Levy and also Mr. Cinnamon, whom he had never met. The witness told Mr. Levy he would not sign the contract because of the statements contained regarding the rental regulations, and said such statements should be taken out and that the parties

could examine the books and records if they desired. He testified Mr. Levy then asked for time until 5 o'clock that evening to do some checking; that witness never heard from Mr. Levy at 5 o'clock or any other time that day nor the next day nor the day thereafter, nor did he hear from anyone representing the plaintiff. The third day he called Mr. Levy's office and was told Mr. Levy was busy.

Defendant further testified: "I was being stalled on the whole thing. I just thought well, if that is the way they want to stall me that is all there was to it, that was all right with me. I was in good faith, ready to recommend this thing to be signed as a deal. I meant good faith, wasn't horsing around". He said it so happened that Mr. Friedman then approached him about the property and he said to Mr. Friedman: "Look, if you want to buy that property, there is only one way you can buy it, as is, where is, how is, with no representations. * * * You made an offer in November of seventy thousand to comply with sixty-five cash less the mortgage on it. * * * We will take it". He said that they then went to Dan Boyle's office and drew the contract in his name as purchaser for the ten men that were interested in buying.

Defendant denied ever seeing the second contract signed by Mrs. Fluke. He said he then had no authority to sell the property for Helen Eder. He denied that he had received any telegram from her, giving such authority. He also denied the telephone conversation by long distance to which Mr. Richardson testified. He said he did receive specific authority from Mrs. Eder to sign the contract on May 8, with Dan Boyle, in the form of a letter. He admitted that he owned a one-half interest in the Studio Building unrecorded; that his niece Helen Eder was the record owner of the property and president of the Victoria Realty Company by which he was employed as manager of the Victoria Hotel. He admitted that some of the memoranda offered by the plaintiff was in his handwriting, showing the operating expenses and receipts of the property supplied to the plaintiff's agents. He denied that he had ever authorized plaintiff or any of its salesmen to show the Studio Building to prospects, but later said he was present when Richardson showed it. He also said that he told Mr. Levy that if his client wanted to buy the building and would revise the contract, he was ready to sell. He was asked regarding Mrs. Fluke being named in the contract as the purchaser and he answered: "Yes; he told me she was a dummy for Barney Cinnamon." "Q. You voiced no objection to that feature? A. Well, no; I didn't voice any objection to that. I voiced objection to the entire contract." He later said he had no particular objections to the first contract signed by Mrs. Fluke, other than the reference to the rental regulations. He said he stated on that occasion that if "Barney Cinnamon wants to buy any property from Helen Eder, the check, the $5,000 check, will be presented to the seller and not to Mr. Mabes". He was asked if, when he went to Mr. Levy's office he was not interested in selling the property and answered: "I have never said I was not interested."

On cross-examination defendant said that in his contract with Dan Boyle, which was closed, there was a provision requiring him to pay a real estate commission; that he had paid $250 to someone to apply on the commission and had settled the balance with Jack Magady; that he had offered Magady $750 because Magady had agreed that the commission would be $1,000. He was asked: "Q. Two fifty is all you paid? A. I gave him that. I says, 'I am getting another five hundred from Helen Eder. I will give you another two fifty * * *'. "Q. You did not pay the usual 5 percent real estate commission? A. Mr. Magady agreed to take a thousand dollars commission."

The plaintiff's witnesses denied that there was any agreement that the contract would be held by the plaintiff until 5 o'clock on the day of the meeting at Mr. Levy's office, but said the only understanding was that the altered contract was to be signed by Mrs. Fluke before it was returned to defendant.

■ The fact alone that defendant disclosed to the plaintiff that the record title was not in his name but in that of Helen Eder, his niece, would not of itself relieve him of liability to the plaintiff on an agreement to pay it a commission for securing a purchaser ready, able and willing to buy the property on the terms specified by him. It was brought out by the evidence of both parties that it was a common practice for persons investing in real estate to take and hold the record title to real estate in the name of others as straw parties for convenience. The defendant himself owned a half interest in the property in question, withholding his deed from the record and leaving his interest and the remaining half in the name of Helen Eder on file. Furthermore, he later conveyed the property to a straw party for Mr. Friedman and others. He made no objection that Mrs. Fluke was to be the named purchaser for Mr. Cinnamon, and said that he knew that she was a "dummy for Cinnamon" and he didn't care so long as he received his price.

Even if defendant owned no individual interest in the property at all, his liability would, nevertheless, follow if he made an agreement to pay a commission to plaintiff to procure a purchaser ready, able and willing to buy on his terms and when such a purchaser was so procured. It was said in Hoyt v. Buder, 318 Mo. 1155, 1170, 6 S.W.2d 947, 953: "One who employs a broker to find a purchaser is usually liable for compensation, regardless of the nature of his interest in the property, and regardless of whether or not he has any interest in it whatsoever." 12 C.J.S., Brokers, § 82, p. 178; Papen v. Friedmeyer, Mo.App., 255 S.W.2d 841, 845; Feldman v. Goldman, Mo.App., 164 S.W.2d 634, 639.

■ Nor does it affect the liability to pay a broker's commission that the employer fails to conclude a sale to the purchaser so procured by the agent. Schaeffer v. Reineke, Mo.App., 121 S.W.2d 213. Nor did the fact that defendant did not own all of the title to the property avoid his liability for a commission. Enright v. Ford, 106 Mo.App. 705, 80 S.W. 291. The fact that the employment to obtain a purchaser for real estate was verbal did not affect the liability to pay for the performance of the agreement, as such contract is not within the Statute of Frauds. It is said in Forsythe v. Albright, 149 Mo.App. 515, 518, 130 S.W. 1126, 1127: "We are not dealing with an action founded on a written contract of sale made by the agent with the purchaser, but with one founded on the breach of a contract of employment. It is well settled that 'a contract providing for the employment of an agent to sell land, to be valid and binding on the owner, is not required to be in writing, but may rest entirely on parol. It is not to be regarded as a contract for the sale of lands, but as an agreement enlisting the services of another to aid the owner in effecting a sale' ".

■ There must, of course, have been an employment of the plaintiff before he was entitled to claim compensation. Bowman v. Rahmoeller, 331 Mo. 868, 55 S.W.2d 453, 457. In our opinion there was sufficient evidence to submit the employment of the plaintiff in the instant case. There was evidence of defendant's own initial and personal solicitation of the plaintiff's services in selling the building; that plaintiff's representatives obtained from defendant in his own handwriting a full statement of the income to date from the respective apartments in the building, the expenses of operation, details respecting the mortgage and insurance, all for the purpose of getting a purchaser; that defendant knew that the plaintiff was showing prospects through the building, and knew that a contract had been signed by a straw party for Mr. Cinnamon, who had put up $5,000 as a deposit, and defendant made no objections to such party so long as he received his price, and treated Mr. Cinnamon as the actual buyer proposed by the plaintiff; defendant personally suggested a single change in the contract which was accordingly made, signed and presented to him. All this is substantial evidence that defendant impliedly, if not expressly, employed the plaintiff to sell the property at the terms named by him; to pay the plaintiff the regular commission of 5 percent, and that he

knew that the plaintiff had produced a satisfactory purchaser and was in the performance of his employment when the property was sold to others at the same price. The issue of employment was submitted to the jury and found in plaintiff's favor.

 The defendant claims that he did not accept the purchaser produced by the plaintiff, and that there is no proof that such purchaser was ready, willing and able to buy on defendant's terms, as stated. Defendant said he knew the party named in the contract as purchaser was acting for Mr. Cinnamon, the actual purchaser; that he had no objection to that arrangement. He knew Cinnamon had placed a check for $5,000 in plaintiff's hands to secure the contract. There was evidence that Cinnamon owned an apartment building in Kansas City and a site where one had recently burned. Defendant met Mr. Cinnamon at the attorney's office when he had the contract altered. Mr. Cinnamon there asked him if there was any objection to his having Mrs. Fluke as the record purchaser, and was told that there was none. Defendant again saw and talked with Cinnamon personally at the Victoria Hotel during the negotiations.

In Schaeffer v. Reineke, supra, the only evidence that the purchaser procured by the agent was ready, able and willing to buy on the employer's terms was that a contract was signed by the purchaser to buy at the price of $32,500 and a check for $5,000 as a deposit was obtained. The court found that this was substantial evidence that the purchaser was ready, able and willing to buy at the price named. In Clark v. King, 209 Mo.App. 309, 238 S.W. 825, a certified check for $5,000 upon a proposed purchase price of $80,000 was deemed sufficient evidence by the court to submit to the jury the issue whether the purchaser was ready, able and willing to buy at the price fixed by the owner.

Whether or not, as a matter of law, defendant accepted the purchaser procured by the plaintiff, thus relieving the plaintiff of the burden of proving the qualifications of its buyer, we need not determine. We deem the evidence sufficient to submit to the jury, as was done, the issue whether or not the plaintiff procured a buyer who was ready, able and willing to purchase the property on the terms specified by the defendant. The jury found that issue in the affirmative. We see no reason to disturb that finding.

 Defendant's last point of error is that "Instruction No. 1 given for the plaintiff is erroneous". Under Rule 1.08 Supreme Court Rules, 42 V.A.M.S., and the case of Ambrose v. M. F. A. Co-op. Ass'n, Mo., 266 S.W.2d 647, this presents nothing for our review. Judgment affirmed.

All concur.