SAMUEL BOWMAN v. F. W. RAHMOELLER, Appellant.—55 S. W. (2d) 453.

Division One, December 20, 1932.

*Bryan, Williams, Cave & McPheeters* for appellant.

*Randolph Laughlin* for respondent.

870

HYDE, C.—This is a suit by a real estate broker for a commission, for negotiating a 30-year lease of a three-story building in the Wellston district of St. Louis. In 1927 defendant was the owner of this building, which was occupied by the Rahmoeller-Flint House Furnishing Company, a corporation operating a furniture store, in which defendant was one of the principal stockholders. Defendant also owned other business property, adjoining this building, which was leased by the Woolworth Company for a five and ten-cent store. The Furniture Company did not have a lease on defendant's building but occupied it on a month to month basis, expecting to give it up whenever defendant could rent it for more than their business justified paying.

In December, 1927, plaintiff wrote defendant, who was in Florida, asking him if he "would entertain a proposition to make a 30-year lease . . . to a very responsible concern which has a capital of not less than ten million dollars." Defendant answered requesting plaintiff to get into communication with Mr. Flint, manager of the Furniture Store. Defendant also wrote Flint to find out who the tenant was and to submit a proposition for a 30-year lease at a rental of $25,000 per year for the first ten years, $30,000 for the next ten years and $35,000 for the remaining ten years, in addition to the taxes

and insurance. Plaintiff met Flint and disclosed to him that his prospect was the W. T. Grant Company, a chain store corporation specializing in merchandise selling from twenty-five cents to one dollar. Plaintiff had been in touch with this company for some time trying to interest them in St. Louis locations. Both plaintiff and Flint wrote defendant on December 29, 1927, about their conference. Plaintiff wrote asking that he might be authorized to submit the proposition mentioned by Mr. Flint which, in addition to the amounts specified by plaintiff to Flint, required the payment of a bonus to the furniture company for giving possession and for improvements made by them on the building. Plaintiff closed his letter to defendant saying: ''I assume, of course, that if I negotiate a satisfactory lease to you that the matter of commission will be taken care of in the usual manner.'' Flint wrote defendant that plaintiff's prospect was the Grant Company and that plaintiff would submit defendant's proposition to them with the furniture company's bonus added.

Plaintiff did submit the proposition to Mr. Sanford of the real estate department of the Grant Company, but he answered that they considered the price ''staggering.'' Plaintiff wrote defendant asking him to reduce the price and also had other conversations with Flint about it, but defendant refused to make a better offer. Defendant also wrote plaintiff asking him to attempt to negotiate a sale to his prospect instead of a lease. Plaintiff continued to write to Sanford, whom he had met in 1927 at the Grant Company's real estate office in New York City, asking him to visit St. Louis and see the property. Sanford promised, in several letters, to come to St. Louis and to notify plaintiff in advance of his arrival. Plaintiff also suggested other buildings and districts as desirable locations for the Grant Company. There is no dispute as to the negotiations between plaintiff and defendant and between plaintiff and the Grant Company throughout the early months of 1928. However, on April 5, 1928, after defendant returned from Florida, he came to plaintiff's office and there is a sharp conflict as to what happened then and thereafter. Both agreed that they talked about a $300,000 valuation for the building; that plaintiff suggested that $18,000 per year would be a six per cent net return on that valuation; and that plaintiff asked to be allowed to submit a 30-year lease on that basis to the Grant Company. Plaintiff said that defendant agreed to this and said ''I will give you thirty days' time to negotiate the lease, and I won't offer it to anyone else during that period, and I won't talk to anyone else about it.'' Defendant's version was that he did tell plaintiff he would not offer the property to anyone else for thirty days; but that he did not tell him he would accept $18,000 annual rental, or that he would change his original price. Defendant said he told plaintiff: ''I will give you thirty days to see what you can do and at the end of thirty days, if you have not done anything, I am going to take this matter

in my own hands and see if I can find a tenant'' and that ''if he did not find a tenant during that thirty-day period that I would feel free and clear to get a tenant myself.''

After this meeting, plaintiff did write Sanford by air mail that defendant's property was now available at $18,000 per year and received an answer from him saying: ''We are now very much interested in this parcel'' and ''we are expecting to leave on a long trip through the southwest the latter part of the month, which will take us to St. Louis.'' Plaintiff and Sanford had other correspondence throughout April in which plaintiff urged him to come to St. Louis. Plaintiff finally asked Sanford to come before May 5th, but he answered ''that it will be impossible.'' As to the continuation of his agency plaintiff testified:

''I had quite a few conversations with him (defendant) after May 5, 1928, at which time I tried to persuade Mr. Rahmoeller to stand on the $18,000 net proposition and he told me he had other parties who were figuring with him at higher rentals, but if I could get the same rental that he was trying to get from the other parties he would be glad to have me continue my efforts to get a lease for him, and he told me he had raised his price to $20,000, $25,000, $30,000 net a year.''

Defendant denied that he had this or any other conversation with plaintiff authorizing him to continue his efforts after May 5th. Between May 17th and June 18th plaintiff and Sanford corresponded about Sanford's proposed trip to St. Louis. Plaintiff said that he had several locations to show him. According to Mr. Flint, plaintiff had, during March or April, brought to look over the building a representative of Neisner Brothers, another five and ten-cent store corporation. Defendant testified that in June another broker called him about Neisner Brothers and he went to see Mr. Smith, the manager of the Woolworth store, to ask him how he ''would like Neisner as a next door neighbor.'' He said Smith thought they would be an undesirable competitor and suggested that he knew the officers of the W. T. Grant Company and the J. C. Penney Company and would write to them about the location. Since they sold higher priced goods than Woolworth, he said they would not be direct competitors. On June 29, 1928, Smith did write the Grant Company, recommending defendant's building and the Wellston business district. This letter was referred to Mr. Story of the Grant Company, who was the head of its real estate department, and he arranged for their representative, Mr. Mesnier, to go to St. Louis to see defendant. He also wrote defendant asking for information about his building. Defendant answered, offering to rent it at $22,000 for the first ten years, $25,000 for the next ten years, and $30,000 for the final ten years.

On the day after defendant wrote this letter to Mr. Story, Mr. Mesnier arrived in St. Louis. There is some conflict between the

statements of defendant, Smith, Story and Sanford concerning Mesnier's trip. According to Story, he did not know that plaintiff had been corresponding with Sanford about defendant's property and when he instructed Mr. Mesnier to go to St. Louis he did not examine the file involving St. Louis real estate. Story also wrote a letter to defendant in which he stated: "Mr. Mesnier thereupon was dispatched in a hurry to St. Louis where he met you. At that time Mr. Mesnier had no knowledge whatever of the correspondence already had between Mr. Sanford of our real estate department and Mr. Bowman, and in fact had never heard of Mr. Bowman." According to Sanford, he was away from New York, at the time Smith's letter was received, but returned just before Mesnier left for St. Louis and told Mesnier "before you go there be sure it is not the same property Mr. Bowman is writing to us about." Defendant said that when Mesnier first appeared: "Before we started to talk any terms at all, I asked Mr. Mesnier whether my property had ever been offered to them by any broker in St. Louis and he said no. I said, 'Do you know Mr. Bowman of St. Louis?' and he said, 'We know no real estate broker in St. Louis other than Mr. Breitt of the Martin and Breitt Real Estate Company.' Then I said to Mr. Mesnier, 'Then we are free to go on and deal direct?' and he said, 'absolutely yes.'" Sanford also testified that Mesnier called on Smith at the Woolworth store and that Smith "gave Mr. Mesnier some very pertinent facts. Mr. Mesnier was introduced to Mr. Rahmoeller by Mr. Smith." Smith testified that he never met the W. T. Grant Company's representative; that he never introduced anybody to defendant, and that he did not know Mesnier. Mesnier was not a witness so we do not have his version.

Mesnier brought back a proposition from defendant dated July 9, 1928, for a lease which provided for a sublease of a part of the building to the furniture company. This was not satisfactory to the Grant Company and on July 27, 1928, they obtained from defendant a new proposition for a lease of the entire building at a rental of $22,000 for the first twenty years and $24,000 for the last ten years. A lease was finally made on these terms. According to defendant's testimony, Sanford himself came to St. Louis to get this proposition, and Sanford, with a man from the engineering department of the Grant Company, inspected the building at that time. It was also shown that Sanford had written to defendant on July 11th. Sanford said: "I was in St. Louis with reference to the Rahmoeller proposition shortly before the lease was closed. I did not call on Mr. Bowman. I did not phone him. I did not let him know that I was in town."

During the last ten days of July plaintiff was at Mt. Clemens, Michigan. While there he wrote defendant asking "that you afford me the opportunity of presenting your property . . . at a net rental of $18,000 per year, which was the sum you fixed on your property after our conference on April 5th." Plaintiff further stated

that he felt confident he could obtain this sum but believed that "no high class business concern can afford to pay a greater rental than $18,000 net." Defendant answered this letter August 1st, stating that "I am not ready at this time to accept a net rental in the amount of $18,000 annually." Plaintiff further testified that he went on to New York about the middle of August and that he was in Sanford's office and discussed defendant's property with him. He said that Sanford told him "he was still interested and that sometime he expected to be in St. Louis and he would then see me and take the proposition up with me," and that he promised he would be there soon after Labor Day. According to defendant's testimony, Sanford had already been in St. Louis prior to this time and obtained plaintiff's written offer for a lease of the building, which plaintiff said he was discussing with him. On August 15th, the Grant Company wired acceptance to defendant of his written offer of July 27th, which he said he delivered to Sanford in St. Louis.

On September 1st, plaintiff wrote Sanford reminding him of his promise to visit St. Louis soon after Labor Day, referring to another property in the Wellston district, and also describing defendant's property and stating with regard to it: "This is probably the best building in the Wellston district and the property adjoins on the west the store occupied by the Woolworth Company. As I told you, the owner originally gave me a net price of $18,000 and afterwards jumped his price $20,000, $25,000 and $30,000, for three ten-year terms of lease. Have been trying to get him back to earth and if I succeed in doing so will advise you." Sanford acknowledged receipt of this letter and stated: "A proposition was submitted to us on the property adjoining the Woolworth store at a very much lesser rental than mentioned in your letter," and also said, "we hope to be able to meet you very shortly."

Defendant left St. Louis about September 19th, and went to California. Plaintiff had some further correspondence with Sanford throughout September and October. He said that during that time he learned that defendant's building had been rented and he so informed Sanford in one of his letters, but he did not then know what firm had rented it and he was not informed by the letter which Sanford wrote in answer to his September letters. When plaintiff learned that defendant had rented his building to the Grant Company, he wrote to him in California reminding him that he got the Grant Company interested in defendant's property. He later demanded payment of his commission, which was refused and this suit was commenced. Upon trial the jury returned a verdict for plaintiff in the amount of $16,900. Defendant has appealed from the judgment entered upon this verdict.

Defendant first contends that his demurrer to the evidence at the close of the whole case should be sustained. Defendant's

argument is that the evidence showed that plaintiff's authority to negotiate the lease terminated May 5, 1928, and that the lease was thereafter obtained through the efforts of Mr. Smith, the manager of the Woolworth Company's store, and not through the efforts of plaintiff. Plaintiff, however, testified that he was authorized by defendant after May 5th to continue his efforts at a higher rental and that the thirty-day period only applied to the $18,000 proposition. Plaintiff also had evidence showing that he did continue his efforts both by letters and by a personal visit to New York. Whether plaintiff's authority ceased entirely on May 5, 1928, whether the thirty-day period applied to a lease at $18,000, and whether plaintiff was authorized to continue negotiations for a lease at an increased amount depends upon the credibility of conflicting evidence and these were all questions for the jury to determine. The detailed statement of facts we have made shows that there was evidence justifying a finding either way and we therefore hold that the plaintiff was entitled to submit his case to the jury.

Defendant's next contention is that the court erred in giving Instruction No. 1, which submitted plaintiff's theory, as follows:

"If you find and believe from the evidence that on December 23, 1927, or thereafter, the defendant requested and employed the plaintiff as his agent to find for him a party or parties who would lease on a rental basis the building then owned by defendant and occupied by the Rahmoeller-Flint Furniture Company at 5977-5979-5981 Easton Avenue, St. Louis, and that thereupon the plaintiff went to work for the defendant and succeeded in arousing the interest of W. T. Grant Company as a prospective lessee for said building, and that plaintiff disclosed to the defendant the name and address of said W. T. Grant Company as a prospective lessee for said building, and that thereafter the defendant himself negotiated a lease of said building to the said W. T. Grant Company behind the back of the plaintiff, *and to avoid paying a commission to plaintiff* and that plaintiff's *efforts were* the procuring cause, *that is, the direct and proximate cause,* of said W. T. Grant Company becoming interested in said building and becoming the lessee thereof under said lease, then you may return a verdict in favor of plaintiff and against defendant." [Italicized words added by the court.]

Defendant says that this instruction overlooks his contention that plaintiff's authority to negotiate a lease expired on May 5, 1928. It is now well settled that, although plaintiff's instructions omit mention of some of defendant's defenses, such error, if any, is cured where such defenses are fully covered by defendant's instructions. [Morrow v. Missouri Gas & Electric Service Co., 315 Mo. 367, 286 S. W. 108; State ex rel. North British & Mercantile Ins. Co. v. Cox, 307 Mo. 194, 270 S. W. 113; State ex rel. Jenkins v. Trimble, 291 Mo. 227, 236 S. W. 651; McIntyre v. St. Louis-San Francisco Ry. Co., 286

Mo. 234, 227 S. W. 1047; Ash v. Natl. Life & Accident Co. (Mo. App.), 40 S. W. (2d) 505; Cottier v. C. B. & Q. Ry. Co. (Mo. App.), 33 S. W. (2d) 173; Royal Indemnity Co. v. Poplar Bluff Trust Co. (Mo. App.), 20 S. W. (2d) 971; Scott v. Am. Mfg. Co., 20 S. W. (2d) 592; Emory v. Emory, 53 S. W. (2d) 908.] This defense was fully covered by defendant's Instruction No. 4 (as offered), which was given as follows:

"The court instructs *you* that the owner of a building has the right, after his agent's authority has been terminated or expired, to enter *in good faith* into direct negotiations for a lease with a person or persons to whom the agent had previously offered said building, when the agency was in force, without incurring any legal liability to such agent for a commission, even though you may believe and find that the efforts put forth by the agent, during the term of his agency, contributed to the decision of the lessee, made after the termination or expiration of the agent's authority, to lease the building. Therefore, if you believe and find from the evidence that the plaintiff's authority to offer defendant's building for lease terminated or expired on May 5, 1928, and if you further find and believe that the W. T. Grant Company first decided to lease said building at a date after or subsequent to May 5, 1928, then your verdict must be for the defendant Rahmoeller and against the plaintiff Bowman, even though you may believe and find from the evidence that the plaintiff had negotiations with the W. T. Grant Company prior to May 5, 1928, which contributed to the ultimate decision of the W. T. Grant Company to lease defendant's building, *unless you find from the evidence that plaintiff's negotiations with Grant Company were the proximate and direct cause of Grant Company's decision to lease.*"

Defendant, however, says that the italicized words at the end of the instruction, which were added by the court, nullified the rule stated in the instruction as offered by the defendant and incorrectly allowed the jury to find for the plaintiff even though they found that plaintiff's authority terminated on May 5, 1928, and that the Grant Company decided after that time to lease the building. The instruction as modified does not limit "plaintiff's negotiations with Grant Company" to negotiations prior to May 5, 1928. In fact, the evidence fails to show that plaintiff's negotiations prior to May 5, 1928, "were the proximate and direct cause of the Grant Company's decision to lease." The most shown is that plaintiff, by his negotiations, prior to May 5, 1928, aroused the Grant Company's interest in the building if it could be had for $18,000, and obtained a promise from Mr. Sanford to look at it, as well as other properties, which plaintiff had as agent to lease, whenever he made a trip west. Sanford, in one of his letters, definitely stated that he could not be in St. Louis to look at it prior to May 5th. Therefore, plaintiff had not at that time procured anyone ready, willing, and able to lease defendant's

building. Nor does plaintiff contend that his efforts prior to May 5th procured a lessee. He only claims to have obtained a promise to look at this building and others. Obviously something further was necessary to procure a lease. Plaintiff does not claim that the Grant Company would have leased this building without seeing it. Plaintiff claims he did do more but was prevented by defendant from closing the deal. He alleges that his belief that "either in the month of May or June, 1928, the said W. T. Grant Co., the said Charles H. Sanford and the said defendant entered into a fraudulent conspiracy to cheat and defraud plaintiff" and that for that purpose "they got together and made a lease behind the back of plaintiff." The result of the modified instruction is that even though plaintiff's authority did terminate entirely on May 5, 1928, yet if his further negotiations without authority brought about the decision to lease he could recover. ■ It is, of course, fundamental that a broker is not entitled to compensation where he acts in the absence of employment although his services are the cause of bringing the parties together and a sale results. [9 C. J. 554, sec. 58; 4 R. C. L. 298, sec. 43.] Even under plaintiff's theory of the case, before he can recover, the jury must find that his authority to represent defendant continued, after May 5, 1928, and that his efforts and negotiations thereafter (in continuation of those before) were the procuring cause of the lease; or, if they were not, that defendant by dealing direct with the Grant Company without plaintiff's knowledge, prevented plaintiff from successfully completing his negotiations to avoid paying plaintiff a commission.

Instruction No. 4 as given is in direct conflict with Young v. Stecher Cooperage Works, 259 Mo. 215, 168 S. W. 611, Gibson v. Pleasant Valley Development Co., 320 Mo. 820, 8 S. W. (2d) 828, LaForce v. Washington University, 106 Mo. App. 517, 81 S. W. 209, and Westerman v. Peer Investment Co., 197 Mo. App. 278, 195 S. W. 78. The rule laid down by these cases is well stated in the Young case. There plaintiff was given an exclusive agency to sell a tract of land within twenty days at $11 per acre. Plaintiff had evidence to show that before the expiration of the twenty days he obtained an offer of $10 per acre for about three-fourths of the land which was communicated to the owner with the name of the prospective purchaser. After the expiration of the plaintiff's agency, the defendant sold this same portion of the land at $10 per acre to the purchaser plaintiff claimed to have procured. The court held that a demurrer to the evidence should have been sustained, saying:

"The contract between Young and the defendant, taken in connection with the fact that Young did not, within the contract time of twenty days, 'secure a purchaser' willing to take the land at the price named, leaves the plaintiff without any cause of action. Under

that contract, had Young within the twenty days introduced to defendant a person able, ready and willing to buy at the price, defendant would have been liable for the commissions whether he ever closed the deal or not. That was his contract. By that contract, the failure of Young to secure such purchaser in the allotted time left the defendant free to sell to any one for such price as suited it. The fact that Young within the contract time found a person or persons willing, able and ready to take a part of the land at a reduced price, even though that fact was communicated to the defendant, and even though the defendant, after the expiration of the contract time, closed with the purchaser on such reduced terms, does not avail the plaintiff.''

■ ■ The question of when a broker is entitled to a commission depends upon his contract. It is, of course, well settled that even though property is placed in the hands of a broker for sale at a certain price, he is entitled to commission for a sale, of which he was the procuring cause while his agency continued, even though the owner conducted the final negotiations and accepted a smaller price in order to make a sale. [9 C. J. 601, sec. 89; 4 R. C. L. 313, sec. 52; 43 A. L. R. 1104, note, in which a number of Missouri cases are cited.] But, if the broker's contract makes the right to commission conditional on a sale at a fixed price or within a definite time, he is not entitled to a commission for sale made at a less price or after such time. [Gibson v. Pleasant Valley Development Co., 320 Mo. 828, 8 S. W. (2d) 828; Young v. Stecher Cooperage Works, 259 Mo. 215, 168 S. W. 611; LaForce v. Washington University, 106 Mo. App. 517, 81 S. W. 209; Westerman v. Peer Investment Co., 197 Mo. App. 278, 195 S. W. 78; 9 C. J. 601, sec. 89; 9 C. J. 606, sec. 92; 4 R. C. L. 305, sec. 47; 26 A. L. R. 784, note.] ■ However, even though the broker's contract of employment makes his right to commission dependent upon obtaining a sale upon a fixed price or within a fixed time, the owner cannot defeat his right to commission if he is guilty of any fraud or bad faith which prevents performance by the broker in accordance with his contract. [9 C. J. 607, sec. 92; 4 R. C. L. 305, sec. 47; 43 A. L. R. 1115, note; Glade v. Eastern Illinois Mining Co., 129 Mo. App. 443, 107 S. W. 1002; Weisels-Gerhart Real Estate Co. v. Epstein, 157 Mo. App. 101, 137 S. W. 320.]

In this case there was a direct conflict as to whether plaintiff had a continuing general agency to obtain a satisfactory lease from December, 1927, until after the lease was made but during that time had an exclusive agency for thirty days to make a lease at $18,000 (which was plaintiff's claim); or whether plaintiff's original agency was ended April 5, 1928, by a new agreement to give him an exclusive agency for thirty days to negotiate a lease at the originally stipulated price to his prospect after which his agency entirely terminated

(which was defendant's claim). Plaintiff had his theory put before the jury by Instruction No. 1, which did not limit plaintiff's right of recovery to a lease procured within any fixed time or amount. We hold that plaintiff had evidence justifying this submission. We also hold that defendant's evidence justified the submission of his theory that defendant's agency was in good faith entirely terminated, by agreement, on May 5, 1928, and that after that time defendant took the matter in his own hands free and clear to get a tenant himself even though it was the party with whom plaintiff had attempted to deal. The parties had a right to make either contract, and it was for the jury to say which they made. We, therefore, hold that giving Instruction No. 4 as modified was reversible error.

██ Plaintiff further contends that, since defendant's answer was a general denial, he was not entitled to Instruction No. 4 (as offered) because, under a general denial defendant was not entitled to show that plaintiff's employment terminated, prior to the time the lease was procured. Plaintiff says this was an affirmative defense which must be specially pleaded. Plaintiff cites Hoyt v. Buder (Mo.), 318 Mo. 1155, 6 S. W. (2d) 947, where it is said that the defense of "revocation" of a contract is in the nature of confession and avoidance and should be so pleaded. Plaintiff here, however, pleads his negotiations with defendant, in detail, up to April 5, 1928, and then pleads the contract made on that date as follows:

"On or about April 5, 1928, the defendant called in person at plaintiff's office and then and there by word of mouth confirmed plaintiff's employment as his agent, told plaintiff that he authorized him to make a lease of his property on the basis of $18,000 per year net; that he would pay him the usual commission if he did so, and that to aid plaintiff to secure a tenant for him at that rental he would give him the exclusive agency for thirty days, to the end that plaintiff's efforts might not be interfered with or embarrassed by negotiations with any other prospect."

It has been held that, under a general denial, a defendant "may prove that the contract sued on was conditional and that the condition was not fulfilled, or that the contract by force of the condition has terminated." [13 C. J. 737, sec. 874; Stewart v. Goodrich, 9 Mo. App. 125.] Also, under a general denial, a defendant, in an action on a contract, may prove that the contract was different from that sued on. [Wilkerson v. Farnham, 82 Mo. 672; Clemens v. Knox, 31 Mo. App. 185; Parker Corn Co. v. Sexton (Mo. App.), 217 S. W. 616; Ruemmeli-Dawley Mfg. Co. v. May Dept. Stores Co. (Mo. App.), 231 S. W. 1031; Walsh v. Venable, 219 Mo. App. 383, 270 S. W. 1003; Smith v. Brougher (Mo. App.), 274 S. W. 532; Main Street Bank v. Werner (Mo. App.), 7 S. W. (2d) 723.] Moreover, plaintiff made no objection to the introduction of defendant's evidence concern-

ing the termination of the contract. We, therefore, hold that defendant could show under his general denial that plaintiff's contract of April 5, 1928, was not as alleged in plaintiff's petition but that it was an entirely different one, which instead of confirming a general employment after a thirty day exclusive agency, terminated all agency on the expiration of that period without results.

Since the case must be retried it is proper to discuss defendant's further contention that Instruction No. 1 was erroneous because it contained the words "behind the back of the plaintiff and to avoid paying commission to plaintiff" and that defendant was entitled to a withdrawal instruction informing the jury that there was no evidence of a conspiracy between Sanford, the Grant Company, or defendant, or either of them, to defraud plaintiff out of his commission nor to make a lease behind plaintiff's back. Defendant's contention is that there was no substantial evidence in the case to warrant such a finding. No doubt the term "behind the back of the plaintiff" in the instruction would be understood by the jury to mean without plaintiff's knowledge. It is not, however, good practice to use such words in an instruction. Similes and parables are all right in argument but they are out of place in instructions, which should state the issues in such plain and simple language that their meaning is clear and unambiguous. However, we do not agree with defendant's contention that there was no substantial evidence of a conspiracy (collusion) to defraud plaintiff out of his commission. We think that, upon plaintiff's theory that his employment was never terminated and that he was with plaintiff's consent throughout May and June attempting to continue negotiations with the Grant Company and get Sanford to come to St. Louis to see defendant's property, that there is substantial evidence to submit such an issue. There is evidence which tends to show that defendant was attempting, with the aid of Sanford at least, to lease the property to plaintiff's prospect without his knowledge and to avoid paying him a commission. Regardless of what Story knew, Sanford knew before Mesnier left New York that he was going to St. Louis to see the very building which plaintiff had been writing him about for several months. Although Sanford had made plaintiff many unfulfilled promises to come there, during the same month that Mesnier went to St. Louis, Sanford wrote to defendant, went to St. Louis himself, and obtained an option on defendant's building at a lesser price than plaintiff was then offering it (while this was more than plaintiff had offered it in April defendant denied his authority to do so and there is also evidence that prices were advancing) and did nothing to let plaintiff know that he was in town. When plaintiff came to New York to see Sanford, about the time defendant's offer was accepted by telegram, he said nothing about his negotiations direct with defendant, but, instead, again promised plaintiff to come to St.

Louis to have plaintiff show him defendant's building. When plaintiff wrote him reminding him of this promise, Sanford did not disclose to plaintiff that a deal had already been made between the Grant Company and defendant, but stated to him that it was being offered to them at a lesser rental than plaintiff had mentioned in his letter, and still promised to meet him. There was evidence that when Mesnier came to St. Louis defendant immediately inquired of him if he knew Mr. Bowman; that neither Sanford nor defendant ever informed plaintiff that they had made a lease; that the lease was never recorded; that plaintiff did not find out about it until after defendant left St. Louis for California; and that although plaintiff had written defendant in July, before the deal was closed, about going on with negotiations, defendant in his answer did not disclose his direct negotations. It was also shown that after plaintiff made a claim for his commission, defendant wrote Mr. Story asking his assistance in combating plaintiff's claim and saying, "I am certain Mr. Bowman has never mentioned your company before, I know of no connection he had with our deal," in spite of the fact that the correspondence between defendant and Flint shows that he did hear of the Grant Company through plaintiff. Of course these facts do not directly or conclusively prove fraud or conspiracy, but fraud, like any other fact, can be shown by circumstantial evidence. Lack of frankness, misstatements of fact, contradictions, and concealment of facts, when found in combination, are persuasive circumstances and we hold that all these circumstances shown in this case were sufficient to justify submitting the issue of fraud and collusion to the jury.

The judgment is reversed and the cause remanded. *Ferguson* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All of the judges concur.