Dale ALCORN and Delmar Alcorn, Plaintiffs-Appellants,

v.

Handy MOORE and Bill Moore, Defendants-Respondents.

No. 8365.

Springfield Court of Appeals.

Missouri.

Jan. 22, 1965.

Dwight Crader, Sikeston, for plaintiffs-appellants.

Manuel Drumm, Sikeston, for defendants-respondents.

STONE, Judge.

In this action at law, plaintiffs, Dale Alcorn and Delmar Alcorn, as licensed real estate brokers sought a commission of $2,500 for the alleged production of a prospect ready, able and willing to purchase a farm in Mississippi County, Missouri (hereinafter referred to as the spillway farm), owned by defendants, Handy Moore and Bill Moore. The jury being unable to agree upon a verdict, a mistrial was declared; and, by after-trial stipulation signed by all parties and interested counsel, it was agreed that the evidence upon trial should be transcribed and that the cause should be submitted to the trial judge for determination on that transcript with the subsequent judgment to "have full force and effect as if said cause was tried again before the court in its entirety." Accordingly, on this appeal by plaintiffs from the judgment thereafter entered in favor of defendants, the case comes to us as a jury-waived, court-tried action.

"Around the last of November" 1962, Dub Crutcher, a licensed real estate broker in Stoddard County, Missouri, was seeking to locate a purchaser for a 300-acre farm in Scott County owned by Alton Evans (hereinafter referred to as the Evans farm). Evans had told Crutcher that "the Moore boys [defendants] were interested" in the Evans farm but that they wanted him (Evans) "to take in" the spillway farm which he was unwilling to do. Reasoning that the Evans farm could be sold to defendants if a satisfactory sale of their spillway farm could be made, Crutcher talked with the Alcorn brothers (plaintiffs) who did more business in Mississippi County than he (Crutcher) did, and in turn Dale Alcorn contacted defendants and arranged for a meeting at plaintiffs' office in Sikeston.[3] At that meeting, defendants frankly expressed their interest in acquiring the Evans farm (then priced at $127,500), which had "a common border [boundary] for a mile" with a 300-acre farm already owned by them, but emphasized their financial inability to do so unless they could realize $100,000 *net* from sale of the spillway farm. The end result of the ensuing discussion was that plaintiffs were given oral authorization to list the spillway farm for sale at $102,500, of which $100,000 would be paid to defendants and $2,500 would be retained by plaintiffs as their commission.

Defendants suggested that Bertie Hale, who had cultivated the spillway farm since 1947, might be able to purchase it, and that, if he wanted the farm, they would like for him to have it. Hale indeed was interested; and, within a few days, he and Lloyd Hall, a nearby landowner, entered into a written contract to purchase the farm for $102,500 conditioned, however, upon their ability to finance the purchase by obtaining

a loan of $85,000 to be secured by a deed of trust covering not only the spillway farm but also a 70-acre tract owned by Hale and an 80-acre tract owned by Hall. With plaintiffs handling the details, Hale and Hall made a loan application to a major life insurance company, and loan representatives of that company interviewed the applicants and appraised the tendered security.

While this loan application was being processed and considered, W. C. Bryant, a landowner in the same area, heard that the spillway farm was for sale and called defendant Handy Moore, who referred him to plaintiffs. When shortly thereafter he talked with plaintiff Dale Alcorn, Bryant said (so Dale testified) that *"if there are 254 acres in that* [spillway] *farm I'll give $102,500 for it."* (All emphasis herein is ours.) With a confidence perhaps inspired by the expectation of collecting a "finder's fee" of one per cent if the loan were made, plaintiffs were so sure that the loan application of Hale and Hall would be approved that they informed Bryant, and likewise told defendants, that the farm "was sold" to Hale and Hall. But "there is many a slip' twixt the cup and the lip," and the loan was not made because applicant Hall was unwilling to include more land (in addition to the 80-acre tract originally contemplated) in the deed of trust securing the loan. Consequently, the spillway farm was not sold to Hale and Hall, and plaintiffs here concede that "it is undisputed that Bertie Hale and Lloyd Hall were unable to complete the contemplated purchase."

Defendant Handy said that he first heard that the sale to Hale and Hall would not be consummated when *Hale* told him (Handy) on the evening of December 17, 1962, that "the loan hadn't gone through and * * * the deal was off." Surprised by this word coming after the assurances plaintiffs had given him, defendant Handy immediately called plaintiff Dale, who confirmed what Hale had said and added "that he [Dale] sure was sorry about it." At the same time, plaintiff Dale stated

(so defendant Handy insisted upon trial) that "he didn't have any other buyer for the farm now [then]."

Being anxious to sell the spillway farm so that defendants would be in position to acquire the Evans farm, defendant Handy "called a number of people that night [December 17]" when he learned that plaintiffs had not sold the spillway farm. He attempted to contact, but could not locate, W. C. Bryant. Among those with whom defendant Handy did talk that evening were "the Barker boys" (Jackie and Kelly H.), also landowners in the same area. After conferring with defendants personally on December 18, the Barkers agreed on December 19 to purchase the spillway farm for *$100,000,* and title to the farm thereafter was conveyed to them on February 27, 1963. The undisputed evidence was that plaintiffs had never contacted the Barkers, did not produce them as prospects, and had nothing to do with their purchase of the spillway farm.

On December 19, 1962, defendants' attorney at Sikeston, dealing directly with Evans, contracted to purchase the Evans farm, title to which subsequently was conveyed to defendants on January 18, 1963. Although (so defendant Handy testified) Evans had "told [defendants] that nobody had his farm listed for sale," defendants agreed to "participate" if Evans paid a broker's commission; and defendants later contributed $900 to Evans, as one-half of the sum paid by him in settlement of a suit instituted by Dub Crutcher, Dale Alcorn and Delmar Alcorn to recover a commission for sale of the Evans farm.

In a conference with their attorney on December 19, 1962, defendants authorized and instructed him to notify plaintiffs "that their services would no longer be needed." Being unable to locate plaintiffs at the moment, defendants' attorney that day mailed to plaintiff *Delmar* a letter (admittedly received by the addressee) which expressed regret that the proposed sale of the spillway farm to Hale and Hall could

not be consummated, recited that "you apparently have no buyer available as of this date," and notified plaintiffs that "my clients [defendants] herewith withdraw the property from your hands." After defendants' attorney and defendant Handy, with their wives, had dinner in Cape Girardeau on the evening of December 19, the attorney (at Handy's suggestion) completed a person-to-person long distance telephone call to plaintiff *Dale,* in the course of which the attorney "asked him if he had a purchaser for the farm in the spillway, which at the time he said he did not," and then told him that plaintiffs' agency was terminated. When plaintiff Dale was asked whether he had received this long distance telephone call, his memory (otherwise excellent) failed him in this fashion: "I sure can't remember it if I did. * * * I thought I would but I sure don't remember. The [spillway] farm was already sold. I don't know that a telephone call would do any good." That the person-to-person call was placed and completed on the evening of December 19 was confirmed by records of the Southwestern Bell Telephone Company. As to what was said in the course of that telephone conversation, the trial court reasonably could have accepted the positive declarations of defendants' attorney who, although trial counsel, testified without objection. See Canons of Ethics, V.A.M.R. Rule 4.19.

■ Relying upon the general principle that brokers earn their commission when they produce a party ready, able and willing to deal on terms prescribed by or acceptable to their principal [Staples v. O'Reilly, Mo. App., 288 S.W.2d 670, 675(4); Sargent v. Wekenman, Mo.App., 374 S.W.2d 635, 639(6); Weber v. Larkin, Mo.App., 380 S.W.2d 956, 958(1)], plaintiffs' theory of the case is that they produced such party in the person of W. C. Bryant. It may be conceded that Bryant was an "able" prospect in that he had the financial ability to have financed the purchase of the spillway farm. Sargent, supra, 374 S.W.2d at 639 (7); Weber, supra, 380 S.W.2d at 958(2);

12 C.J.S. Brokers § 85 b, l. c. 193. But the contention that he also was "ready" and "willing" to deal on terms prescribed by or acceptable to defendants requires closer attention.

Returning to the record, we recall that, when Bryant talked with plaintiff Dale (at the suggestion of defendant Handy) and was told that the spillway farm "was sold" to Hale and Hall, Bryant's statement (as reported upon trial by plaintiff Dale) was that *"if there are 254 acres in that* [spillway] *farm* I'll give $102,500 for it." Plaintiffs here assert that "the undisputed evidence" was that the spillway farm contained 254 acres, pointing specifically to the testimony of *witness Turner,* a loan representative of the insurance company which rejected the Hale-Hall loan application. However, Turner's testimony as to acreage was by no means so positive and reassuring. It is true that *"at a later date"* (not definitely fixed in the transcript) Turner eventually came around to the personal belief that the total acreage in the spillway farm was "approximately 253 or 54." But it appears that this was *after* the Hale-Hall loan application had been rejected. For, in earlier efforts to verify the acreage and legal description in the loan application by examination of ASC (Agricultural Stabilization and Conservation Service) maps and records, Turner had found that "their acreage was so much short" and there was such "a difference in the legal description" that he then "thought there was some discrepancy there"; and, when plaintiffs' counsel inquired "did you get that cleared up," Turner answered "not in connection with this [loan] application." Furthermore, Turner's testimony contained references to what examining counsel called "two disputed tracts" and Turner described as "the disputed acres * * * partially lying in woods" and "in the bayou" and not enclosed with fences, which said tracts contained "approximately 10 acres" and were not covered by defendants' abstract. And, when Turner discussed with Hale, who had cultivated the spillway farm for 15 years,

"what was included in the farm, the only thing that he [Hale] was fairly positive on was the number of cultivated acres"—a "number" which counsel did not undertake to elicit and Turner did not see fit to disclose. The transcript does not indicate that *defendants* ever made a more definite representation as to acreage than that the spillway farm contained *"254 acres, more or less."*

Of more significance upon this inquiry as to whether Bryant was a "ready" and "willing" buyer was his own testimony. After his conversation with plaintiff Dale in which he (Bryant) had been told that the spillway farm "was sold" to Hale and Hall, Bryant nevertheless had sought further information as to acreage by turning to the same maps and records that Turner also had examined, namely, those in the ASC office, with the result that (in Bryant's words) *"the best we could determine it* [the acreage] *was 231."* Bryant's testimony plainly shows that, after his investigation at the ASC office, he had no reason to believe, and did not believe, that the spillway farm actually contained more than 231 acres. Even after the spillway farm had been sold to the Barkers, Bryant (not yet apprised of that sale) told defendant Handy, when he happened to see him in East Prairie, that "I [Bryant] couldn't find but 231 acres in the farm."

Bryant testified that, if he had been asked to contract for purchase of the spillway farm, he would have insisted upon a contractual provision limiting the permissible variation from 254 acres; that he would not have objected if the acreage had "just varied three or four acres"; that, however, "when you get land up around $400 an acre you have almost got to get pretty close to what you pay for"; and that, after his investigation indicated that the spillway farm actually contained about 231 acres, he certainly would not have paid $102,500 for it. When the blunt interrogation was put to Bryant, *"on the knowledge you had at that time after Hale* [and Hall] *had been turned down* [on their loan appli-

cation] *you weren't ready and willing to pay $102,500, were you,"* his unequivocal response was *"no."* In further confirmation of this, Bryant testified that, after the Hale-Hall loan application had been rejected, he and Wendell Choate had agreed to "go partners" and offer to buy the spillway farm *"if they* [defendants] *would reduce the price according to the acres between 254 and what they could show us was in it."* Both Bryant and Choate believing that the spillway farm contained about 231 acres, *"the way we had it figured* [the sale price] *would be around $92,000."*

■ Whether a broker has become entitled to a commission depends upon the terms of his contract [Spitcaufsky v. Guignon, Mo., 321 S.W.2d 481, 487(1); Wolcott v. Moser, 364 Mo. 443, 452, 262 S.W.2d 620, 625(4); Bowman v. Rahmoeller, 331 Mo. 868, 879, 55 S.W.2d 453, 458] and, of course, the owners may, by such contract, condition their liability for payment of a commission upon prescribed contingencies or events [Tant v. Gee, 348 Mo. 633, 638, 154 S.W.2d 745, 747(3); Staples, supra, 288 S.W.2d at 676(9); Clarkson v. Standard Brass Mfg. Co., 237 Mo.App. 1018, 1031, 170 S.W.2d 407, 414(3)], such as production of a prospective purchaser ready, able and willing to pay a stated price for the property. Rosenblatt v. Multin, Mo. App., 222 S.W.2d 587, 592; Hughes & Thurman v. Dodd, 164 Mo.App. 454, 459, 146 S.W. 446, 447. In the instant case, there is no reasonable room for doubt but that the agreement between plaintiffs and defendants was such that payment of a commission of $2,500 to plaintiffs was conditioned on sale of the spillway farm for $102,500 or production of a prospect ready, able and willing to purchase for that sum. Martin v. Mercantile Trust Co., Mo., 293 S.W.2d 319, 326(5), and cases there cited. In fact, plaintiffs do not contend to the contrary but rather assert, as we have said, that they did produce, in the person of W. C. Bryant, a prospect ready, able and willing to purchase for $102,500. But, viewed in the cold light of realism rather than

in the thick fog of wishful thinking, Bryant's own testimony did not present him as "ready" and "willing" to pay $102,500 for the spillway farm after the Hale-Hall loan application had been rejected; and, prior to that time, plaintiffs admittedly had informed all inquirers that the farm "was sold" to Hale and Hall. Furthermore, plaintiff Dale admitted that, after the single occasion on which Bryant had been in plaintiffs' office and had been sent away with the word that the spillway farm "was sold" to Hale and Hall, plaintiffs had not contacted Bryant again.

■ Although not presented in their only "point relied on" [V.A.M.R. Rule 83.05(e)], plaintiffs correctly state, in the "argument" section of their brief, that an owner cannot defeat his broker's right to a commission if he (the owner) is guilty of fraud or bad faith which prevents the broker's performance in accordance with his contract. In each of the cases cited to this principle [Bowman, supra, 331 Mo. at 879, 55 S.W.2d at 458(7); Feinstein v. Glick, Mo.App., 116 S.W.2d 141, 144(1)], the owners had dealt directly with parties who first had been presented to the owners by the plaintiff broker. In the instant case, defendants dealt with the Barkers, who had never been contacted by plaintiffs and were not presented by them. Instant plaintiffs' emphasis here is upon defendants' alleged want of good faith in dealing directly with the owner in their *purchase of the Evans farm*. But this is an action at law, on the oral agreement between plaintiffs and defendants, for a commission for *sale of the spillway farm;* and, regardless of whether defendants' conduct in connection with their *purchase of the Evans farm* evidenced "something less than good faith" (a question not here relevant and therefore not determined) such conduct certainly would not dictate a finding that defendants, in their *sale of the spillway farm* to the Barkers, were guilty of fraud or bad faith which prevented plaintiffs' performance as brokers.

■ Plaintiffs' contract neither granted an exclusive right to sell nor continued in effect for a fixed term. In the circumstances of the instant case, the applicable general principles are that, where a broker has not been given an exclusive right to sell, the owners may, without incurring liability to the broker, sell to a purchaser not produced by the broker, if such sale be made without the aid of a broker and before he has procured a ready, able and willing purchaser and has given notice thereof to the owners [Byers Bros. Real Estate & Ins. Agency, Inc. v. Campbell, Mo.App., 329 S.W.2d 393, 396(1); Cook v. Salisbury, Mo.App., 225 S.W. 112, 113(1); 12 C.J.S. Brokers § 75, p. 166; 12 Am.Jur.2d, Brokers, § 224, p. 965; annotation 88 A.L.R.2d 936, 941(3)] and that, where a broker's agency is not for a fixed term or duration, it may be revoked and terminated by either party in good faith after the lapse of a reasonable time and upon notice to the other party. Evans v. Jacobson, Mo.App., 269 S.W.2d 156, 160(2); LaForce v. Washington University, 106 Mo.App. 517, 523–524(1), 81 S.W. 209, 211; George B. Loving Co. v. Hesperian Cattle Co., 176 Mo. 330, 351(1), 75 S.W. 1095, 1101. Recalling that both defendant Handy and defendants' attorney testified positively that, after the Hale-Hall loan application had been rejected, plaintiff Dale had said that he had no ready, able and willing purchaser at that time, and mindful that plaintiffs' agency as brokers then had continued for about three weeks during which defendants had in no wise hindered or interfered with plaintiffs' performance [Evans, supra, 269 S.W.2d at 160], we are unwilling to hold, contrary to the judgment nisi, that defendants acted unreasonably or in bad faith in terminating the non-exclusive agency.

Although, in this court-tried action, it is our duty to "review the case upon both the law and the evidence as in suits of an equitable nature" [V.A.M.R. Rule 73.01(d); V.A.M.S. § 510.310(4)], the same antecedent statute and superseding rule direct

that "[t]he judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Coen v. Eldridge, Mo., 347 S.W.2d 207, 210(4); Beckemeier v. Baessler, Mo., 270 S.W.2d 782, 783(1). With appropriate respect for these basic principles of appellate review, we think the conclusion inescapable that the judgment for defendants should be affirmed. It is so ordered.

RUARK, P. J., and HOGAN, J., concur.